QUICK POINT PENCIL COMPANY, a Missouri Corporation, Appellant,

v.

Jane ARONSON (formerly known as Jane Leopoldi), Appellee.

No. 77–1142.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1977.

Decided Dec. 8, 1977.

Rehearing and Rehearing En Banc Denied Jan. 4, 1978.

Thomas E. Wack, St. Louis, Mo., for appellant; Walter M. Clark, Fred Leicht, Jr., and William J. Travis, St. Louis, Mo., on brief.

Robert E. Knechtel, Dominik, Knechtel, Godula & Demeur, Chicago, Ill. (argued), Mark T. Keaney, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo. and Alan B. Samlan, Chicago, Ill., on brief, for appellee.

Before LAY and ROSS, Circuit Judges, and LARSON, Senior United States District Judge.*

ROSS, Circuit Judge.

Quick Point Pencil Company, a Missouri corporation, brought this action for declaratory judgment, naming Jane Aronson, an

* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

Illinois resident, as defendant. The amount in controversy exceeded the statutory $10,000 and the district court had jurisdiction pursuant to 28 U.S.C. § 1332.[1] As the basis for the action, Quick Point alleged a contract between the parties negotiated in June and July of 1956, wherein Aronson granted Quick Point an exclusive license to manufacture and sell a keyholder for which Aronson (formerly Jane Leopoldi) had submitted a patent application, Serial No. 542,677, on October 25, 1955. In exchange for the exclusive license Quick Point promised to pay Aronson a five percent royalty, to be reduced to two and one-half percent if no patent were granted within five years. Quick Point agreed to pay these royalties for as long as it continued to manufacture and sell the keyholders. Aronson never obtained a patent on the keyholder but Quick Point paid royalties under the agreement until October of 1975,[2] for a total of $203,963.84.

In its complaint Quick Point alleged that the license agreement, providing for royalties on an unpatented and unpatentable article for an indefinite duration, conflicted with article I, section 8, clause 8 of the United States Constitution,[3] and the Supremacy Clause.[4] It sought declarations that the agreement was unenforceable and that it had no further liability to make royalty payments under the license. After the parties filed a joint stipulation of uncontested facts and cross-motions for summary judgment, the district court took the case under submission without trial.

On December 29, 1976, the district court ordered, adjudged and decreed that the contract is valid and enforceable and Quick Point has the continuing liability to make royalty payments for as long as it manufactures the keyholders. He concluded that "[t]he language of the agreement is plain, clear and unequivocal and has no relation as to whether or not a patent is ever granted or is not granted." *Quick Point Pencil Co. v. Aronson*, No. 75–1056C(1), 425 F.Supp. 600 (E.D.Mo., filed Dec. 29, 1976). He determined that this case is not controlled by *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); nor *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Quick Point appeals from that judgment.

Quick Point contends that the district court erred in holding that this case is governed solely by contract law without regard for federal patent and antitrust considerations. It argues that the principles set forth in *Lear, Inc. v. Adkins, supra*, should be controlling here. Aronson contends that the contract contains an unequivocal promise to pay a royalty which is independent of the existence of a patent and enforceable as long as Quick Point continues to manufacture the keyholder.

■ The issue we must decide is whether Quick Point, a patent application licensee, is bound by the contractual provision requiring it to pay royalties for as long as it manufactures the item described in the patent application even though the licensor

---

1. 28 U.S.C. § 1332(a)(1) provides:
   (a) the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
      (1) citizens of different States;
      *    *    *    *    *    *

2. Quick Point Pencil Company continues to make and sell the keyholders but is no longer making royalty payments under the agreement.

3. The United States Constitution provides:
   [The Congress shall have Power]
   To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;
      *    *    *    *    *    *
   U.S.Const. art. I, § 8, cl. 8.

4. The Supremacy Clause provides:
   This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, and any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
   U.S.Const. art. VI, cl. 2.

abandoned the application many years ago and the licensee's competitors are freely manufacturing the unpatented item.[5] We believe it is not so bound and reverse the district court's judgment.

The issue involves the relationship between state contract law and federal patent law. Although the Supreme Court has not decided the precise question, it has dealt with the conflict in similar contexts and has established principles that can be applied here.

We begin with the principle that federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent. *See Lear, Inc. v. Adkins, supra,* 395 U.S. at 656, 89 S.Ct. 1902; *Sears, Roebuck & Co. v. Stiffel Co., supra,* 376 U.S. at 232–33, 84 S.Ct. 784; *Compco Corp. v. Day-Brite Lighting, Inc., supra,* 376 U.S. at 238, 84 S.Ct. 779. In *Sears* the Court made the following statement concerning the relationship between state laws on unfair competition and the federal patent laws:

> To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public. The result would be that while federal law grants only 14 or 17 years' protection to genuine

inventions, see 35 U.S.C. §§ 154, 173, States could allow perpetual protection to articles too lacking in novelty to merit any patent at all under federal constitutional standards.

376 U.S. at 231–32, 84 S.Ct. at 789.

We believe this principle applies to a state's contract law as well as to state unfair competition laws, *at least when a patent application is involved.* Further support for this belief is found in *Lear, Inc. v. Adkins, supra,* 395 U.S. at 677, 89 S.Ct. at 1914 (Black, J., joined by Warren, C. J., and Douglas, J., concurring in part and dissenting in part):

> The national policy expressed in the patent laws, favoring free competition and narrowly limiting monopoly, cannot be frustrated by private agreements among individuals, with or without the approval of the State.

In *Lear* a patent licensee attempted to defend a suit for royalties by challenging the validity of the underlying patent. The situation was similar to the one involved here. While the patent application was pending the inventor and the manufacturer contracted for an exclusive license-royalty arrangement. Before the patent was allowed the manufacturer discontinued the royalty payments because it believed that the improvements were not sufficiently novel and that the inventor would never be able to obtain a patent.[6] The patent office did grant a patent and the inventor sued

---

**5.** The dissent describes the contract as a "trade-secret licensing agreement." We doubt that the keyholder could ever have been characterized as a trade secret. Although it may have been an "invention," it was a relatively simple device and once marketed, it was completely disclosed. *See* Restatement of Torts § 757, comment b. ("Matters which are completely disclosed by the goods one markets cannot be his secret.")

The dissent agrees that the parties "intended that Aronson would in good faith attempt to patent the keyholder." The language from Milgrim's law review article quoted by the dissent further supports our conclusion that patent principles apply in this case. Milgrim states:

> * * * the license reward for a trade secret tends to be a function of consideration for disclosure; for a patent, consideration for use * * *. Since a prospective trade se-

cret licensee knows that his licensor cannot protect him from independent developers, he weighs the value of disclosure against the risks of relying on matter which is subject to third-party royalty-free use. Whether articulated or not, such balancing is the stuff that leads to hard negotiating for royalty rate and duration.

Milgrim, *Sears to Lear to Painton: Of Whales and Other Matters,* 46 N.Y.U.L.Rev. 17, 30 (1971). Quick Point contracted for "the exclusive right to make and sell keyholders of the type shown in [Aronson's] application * *." The agreement was not for disclosure but for the exclusive right to manufacture an invention that was to be patented.

**6.** Unlike the contract involved here the parties had agreed that if no patent were issued or if a patent were later declared invalid, the manufacturer had the right to terminate the license.

for royalties. The Supreme Court of California refused to allow the manufacturer's patent invalidity defense holding that it was estopped by the contract to make that challenge. Finding that such a rule would significantly frustrate overriding federal policies, the United States Supreme Court reversed.

Under the rule announced in *Lear,* if Aronson had obtained a patent which was later determined to be invalid, Quick Point's liability would have terminated.[7] In fact Quick Point could have challenged the validity of the patent and suspended payment of royalties while making the challenge. *See Lear, Inc. v. Adkins, supra,* 395 U.S. at 674, 89 S.Ct. 1902.

Although Aronson's position is different than the inventor's in *Lear* because no patent was granted here, we believe, as the Supreme Court did, that "enforcing this contractual provision would undermine the strong federal policy favoring the full and free use of ideas in the public domain." *Id.* at 674, 89 S.Ct. at 1913.

Two other Supreme Court decisions lend support to our conclusion. In *Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), the Court held: "[A] patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*" *Id.* at 32, 85 S.Ct. at 179. So if Aronson had obtained the patent for which she applied, after 17 years the contract with Quick Point would have been invalid and Quick Point's liability for royalties terminated.

In *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), the Supreme Court faced another situation involving a conflict between state trade secret law and federal patent policies. In holding that state trade secret laws may protect unpatented but clearly patentable inventions without conflicting with the patent law policy of disclosure, the Supreme Court stated:

> The possibility that an inventor who believes his invention meets the standards of patentability will sit back, rely on trade secret law, and after one year of use forfeit any right to patent protection, 35 U.S.C. § 102(b), is remote indeed.

*Id.* at 490, 94 S.Ct. at 1890.

Not only did Aronson not rely on trade secret protection, it is doubtful that her keyholder would have been entitled to any such protection. The Court stated:

> A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.

*Id.* at 476, 94 S.Ct. at 1883 (footnote omitted).

Any member of the general public could have inspected Aronson's keyholder in an attempt to determine how to manufacture it.[8] *See Sears, Roebuck & Co. v. Stiffel Co., supra,* 376 U.S. at 231–32, 84 S.Ct. 784. Aronson did not take this chance. She applied for a patent, contracted with regard to that patent application,[9] and cannot now

---

**7.** The precise point at which a licensee's liability for royalties may terminate under the rule announced in *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1968), is a matter of some dispute. In *Lear,* the date of the patent's issuance was the decisive date, but Lear had challenged the patent before it issued. Here Quick Point sought a decree that it had no *further* liability for royalties, so the date of Quick Point's challenge becomes the crucial date.

**8.** That, in fact, is what has happened here. The parties stipulated, and the district court found, that in the late 1960's Quick Point's

competitors began making keyholders similar to the one in question and since no patent was ever granted they continue to make these similar keyholders without paying royalties. No state law could prohibit this copying. *See Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231–32, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

**9.** Jane Aronson contends that the contract provision reducing the royalties if no patent issued within five years indicates that patent law was not considered by the parties nor applicable here. Quick Point suggests that that provision does not indicate that it anticipated that if no

argue that patent law principles are irrelevant to this case.[10]

■■■ Aronson believed her invention was patentable and she submitted a patent application. Had a patent issued she would have had 17 years of exclusive rights to her invention before it became part of the public domain. She approached Quick Point with her idea and the parties entered into a contract anticipating that a patent would issue. If that had happened, under *Brulotte v. Thys Co., supra*, 379 U.S. at 32, 85 S.Ct. 176, Quick Point's liability for royalties would have ended after 17 years *in spite of the contract*. Furthermore, if a patent had issued and Quick Point had later questioned the patentability of the keyholder, under *Lear, Inc. v. Adkins, supra*, 395 U.S. at 674, 89 S.Ct. 1902, it could have stopped making royalty payments and challenged the patent in court. If such a challenge were successful, Quick Point's liability for payments would have ended *in spite of the contract*.[11] We do not believe the result should be different here. The principles discussed above strongly indicate that any other conclusion would violate public policy.

We conclude that Quick Point, who contracted for an exclusive license to manufacture and sell an item for which the licensor had submitted a patent application, is not bound by a provision for prolonged royalty payments since the licensor abandoned the

application[12] and no patent was ever obtained.[13]

The judgment of the district court is reversed and the case remanded for disposition consistent with this opinion.

LARSON, Senior District Judge, dissenting.

I respectfully dissent.

The majority appears to acknowledge that the contract here was not conditioned on the issuance of a patent.[1] Yet it attributes considerable importance to the fact that a patent application was "involved" and appears to hold that a private agreement which "involves" an abandoned patent application may not be enforced as a matter of federal policy.[2] Because that holding appears to be based on a characterization of the issues with which I disagree, I deem it necessary to discuss in some detail my understanding of the legal principles governing this case.

First, the nature of the contract between Quick Point and Aronson should be clarified. In retrospect, Quick Point made a bad bargain. It agreed to pay royalties on the Aronson invention as long as it continued to make and sell the same, and the agreement, as the district court found, had *no relation to whether or not the item was ever patented. Quick Point Pencil v. Aronson*, No. 75–1056C(1), 425 F.Supp. 600 (E.D.Mo., filed

---

patent was issued within five years none would ever issue, but that it provides for the possibility that the patent would issue at a date more than five years after the contract was signed. We need not speculate as to what agreement the parties might have reached had no patent application been involved—one was.

**10.** In her brief Aronson argues that the pending patent application was *relevant* because it contained a disclosure that was maintained in secrecy by the United States Patent Office and thus was not available to the general public. On the other hand she contends that the agreement was *independent* of the existence of a patent.

**11.** Although the parties here did not expressly condition their agreement on the issuance of a patent, under the facts of this case and in view

of our decision, we believe the result would be the same as in *Lear, Inc. v. Adkins, supra*.

**12.** It is interesting to note that Aronson abandoned her effort to get a patent in September of 1961, about six months after her husband applied for a patent on a similar device. He received a patent in 1964.

**13.** In view of our conclusion we need not reach Quick Point's contentions that the license was in restraint of trade and violated the federal antitrust laws, or that under Missouri law the license was not enforceable.

**1.** *See* footnote 11 of the majority opinion, *supra*.

**2.** *See* footnote 9 and text accompanying notes 12 and 13 of the majority opinion, *supra*.

Dec. 29, 1976).[3] The parties no doubt intended that Aronson would in good faith attempt to patent the keyholder, but Quick Point nevertheless bound itself to pay even if those efforts failed. It should be emphasized that had the contract been *conditioned* on the issuance of a patent, it would have terminated long ago by its own terms. Similarly, had Aronson abandoned the application in bad faith while there was a reasonable likelihood of success with the Patent Office, Quick Point might very well have had a breach of contract remedy. But there is no indication whatsoever that Aronson exercised bad faith and one can only assume that the parties acquiesced in the 1961 Patent Office's determination that the invention was unpatentable or, at least, agreed that no further efforts were required.

With the nature of the contract thus identified, and hypothetical possibilities set aside, the core of this controversy becomes clear: these parties entered into a trade-secret licensing agreement[4] that provided for payment of royalties for an indefinite time on an item that proved to be unpatentable and which others have now copied. One party now seeks to be released from its contractual obligation. Thus stated, this case is virtually on all fours with *Warner-*

*Lambert Pharmaceutical Co., Inc. v. John J. Reynolds, Inc.,* 178 F.Supp. 655 (S.D.N.Y. 1959), *aff'd,* 280 F.2d 197 (2d Cir. 1960). In *Warner-Lambert,* a manufacturer agreed to make payments to the discoverer of the formula for Listerine as long as it continued to manufacture the product. The formula eventually became public, after many years under the agreement, and Warner-Lambert sought release from the contract. The court upheld the agreement, and established the rule that "A license agreement with respect to a trade secret may last indefinitely and does not, in absence of express contrary language, terminate when the secret is disclosed." 2 Callman, *Unfair Competition and Trademarks* § 57(b) (3rd ed. 1968). This court must decide whether, in light of various federal policies expressed by the Supreme Court since the *Warner-Lambert* decision, the result on these facts should be different than it was in the Listerine controversy.[5]

Before reaching the issues that seem decisive here, some of appellant's arguments should be addressed. Appellant recognizes the parallels between this case and *Warner-Lambert* but contends that the fact that a patent application was "involved" distinguishes this case and invokes certain poli-

---

**3.** The majority notes that had a patent issued Quick Point would have had to pay royalties only for the patent period, in light of *Brulotte v. Thys,* 379 U.S. 29, 89 S.Ct. 1902, 13 L.Ed.2d 99 (1964). That is true, but in this context is relevant only to the patent misuse analogy that appellant appears to be drawing and which I have discussed at footnote 9, *infra.* It might also be pointed out that had a valid patent issued in 1961, when it was in fact denied, Quick Point would still be liable for royalties until 1978.

**4.** The majority questions characterizing this agreement as a trade-secret licensing agreement, noting that the keyholder was a simple device and could be copied. The fact remains that the keyholder was secret at the time it was disclosed and it was not successfully copied until the late 1960's, long after it had been marketed. It is precisely because disclosure and marketing may lead to copying that parties will enter into express contracts extending payment obligations beyond the duration of secrecy. The question is whether such agreements are enforceable as a matter of contract law, not whether, absent an express agreement, trade

secret law would afford protection once copying has occurred.

**5.** It should be noted that Quick Point did not argue on appeal that the contract was unenforceable under state law for being of infinite or uncertain duration. This subject was treated at length in *Warner-Lambert Pharmaceutical Co., Inc. v. John J. Reynolds, Inc.,* 178 F.Supp. 655 (S.D.N.Y.1959), *aff'd,* 280 F.2d 197 (2d Cir. 1960), and that court took into account Missouri law, which would probably govern the Quick Point contract. Although there is a canon of contract construction which provides that an obligor of a contract indefinite as to duration will be released from his duty after a reasonable time, *see Freeport Sulphur Co. v. Aetna Life Ins. Co.,* 206 F.2d 5, 8 (5th Cir. 1953), it is somewhat doubtful that that canon would apply here—Quick Point had within its power the ability to terminate the contract of its own accord by ceasing manufacture; it was also permitted to terminate if it became "dissatisfied" with the volume of sales.

cies expressed in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). This contention is apparently what persuaded the majority to analyze the issues as it did, but I find appellant's arguments unpersuasive and a brief explanation may clarify my view that the "involvement" of a patent application has no bearing on the resolution of this case.

In the first part of the *Lear* decision the Supreme Court abolished the doctrine of patent licensee estoppel, 395 U.S. at 670–71, 89 S.Ct. 1902. In the second portion of the opinion, upon which appellant relies here, the Supreme Court considered whether Adkins could claim contractual royalties for the entire patent period based on the pre-issuance disclosure of trade secrets:

> The inventor does not merely argue that since Lear obtained privileged access to his ideas before 1960, the company should be required to pay royalties accruing before 1960 regardless of the validity of the patent which ultimately issued. He also argues that since Lear obtained special benefits before 1960, it should also pay royalties during the entire patent period (1960–1977), without regard to the validity of the Patent Office's grant. We cannot accept so broad an argument. *Id.* at 672, 89 S.Ct. at 1912.

Quick Point contends that there is no distinction between the situation in *Lear,* where a patent application is licensed, a patent issues, and the patent is then declared invalid and the situation here, where a patent application is licensed, and the Patent Office then refuses to issue a patent. In neither case should royalties based on disclosure of a trade secret be enforced.

But there is a clear distinction between the two situations which becomes readily apparent upon examining the major policy underpinning the Supreme Court's decision. The Court was wary of enforcing the claimed trade secret royalties in *Lear* because as a practical matter it would undercut the abolition of the licensee estoppel doctrine:

> Adkins' position would permit inventors to negotiate all important licenses during the lengthy period while their applications were still pending at the Patent Office, thereby disabling entirely all those who have the strongest incentive to show that a patent is worthless. 395 U.S. at 672, 89 S.Ct. at 1912.

In other words, if the trade secret disclosed in a licensing agreement coincided exactly with what was made public in the patent,[6] and the licensee was nevertheless bound to pay on the basis of the initial disclosure, he would have no incentive to challenge the patent itself—his obligation would remain the same whatever the patent's validity. The public would thus be deprived of an effective challenge to patentability and would go on "paying tribute to [a] would-be monopolist." *Id.* at 670, 89 S.Ct. at 1911. This policy of "unmuzzling" the licensee, and even giving him a positive incentive to challenge patent validity, is not implicated in the situation where no patent issues, and where in fact the secret disclosed must be regarded as unpatentable.[7] In ignoring this policy, appellant has essentially construed *Lear* as calling into question the validity of *any* trade secret agreement.[8] In light of

**6.** The trade secrets that Adkins disclosed were precisely the same as those disclosed in the issued patent, *see Brief for Respondent Adkins* at 49–50. *See generally*, McCarthy, " 'Unmuzzling' the Patent Licensee: Chaos in the Wake of Lear v. Adkins," 45 Geo.Wash.L.Rev. 429 (1977).

**7.** For other cases in which the parties' express contract was not predicated on the issuance of a patent, but a patent application was "involved" and the courts held that *Lear* did not govern the case, *see Wrigley v. Compudyne Corp.*, 390 F.Supp. 478 (E.D.Pa.1975); *Heltra Inc. v. Richen-Gemco, Inc.*, D.C., 395 F.Supp.

346 (1975), *rev'd on other grounds*, 191 USPQ 663 (4th Cir. 1976).

**8.** Appellant's reading of *Lear* also relies on another portion of the opinion. The Supreme Court declined to decide whether Adkins could claim royalties accruing *before* 1960, the date when the patent issued, since "it squarely raises the question whether, and to what extent, the states may protect owners of *unpatented* inventions who are willing to disclose their ideas to manufacturers only upon payment of royalties." 395 U.S. at 674, 89 S.Ct. at 1913. It is this portion of *Lear* which raised many questions as to the validity of state trade secret

the Supreme Court's subsequent decision in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), it is clear that *Lear* cannot be extended so far.

*Kewanee* was a trade secret misappropriation case in which the Supreme Court held that as a general rule state trade secret law is not incompatible with federal patent policy. More specifically, the Supreme Court implicitly approved the enforcement of trade secret licensing agreements:

> Another problem that would arise if state trade secret protection were precluded is in the area of licensing others to exploit secret processes. The holder of a trade secret would not likely share his secret with a manufacturer who cannot be placed under binding legal obligation to pay a license fee or to protect the secret * * *. Instead, then, of licensing others to use his invention and making the most efficient use of existing manufacturing and marketing structures within the industry, the trade secret holder would tend either to limit his utilization of the invention, thereby depriving the public of the maximum benefit of its use, or engage in the time-consuming and economically wasteful enterprise of constructing duplicative manufacturing and marketing mechanisms for the exploitation of the invention. The detrimental misallocation of resources and economic waste that would thus take place if trade secret protection were abolished with respect to employees or licensees cannot be justified by reference to any policy that the federal patent law seeks to advance. 416 U.S. at 486–87, 94 S.Ct. at 1888 (citations omitted).

*See also Painton & Co. v. Bourns, Inc.*, 442 F.2d 216 (2d Cir. 1971); *Sinclair v. Aquarius Electronics, Inc.*, 184 USPQ 682 (Cal. Dist.Ct. of Appeal, 1st Dist., Div. Two,

1974). *Kewanee* thus limited the potentially broad implications of *Lear* that appellant urges and it is *Kewanee* rather than *Lear* to which this court should look for guidance in answering the question presently before it.

Appellant contends that this case is distinguishable from *Kewanee* because the trade secret disclosed is no longer secret. It is true that *Kewanee* dealt not with an express contract extending trade secret royalties beyond the duration of secrecy, but with the more typical misappropriation case in which there are inherent limitations upon the protection the trade secret owner receives. Absent an express contract, the owner's rights against even those who learned the secret from a confidential relationship end within a certain time after, for example, independent discovery by a third party, *see* 416 U.S. at 489–90, 94 S.Ct. 1879. That is not to say, however, that duration is determinative in ascertaining whether trade secret law conflicts with patent law, for trade secret protection can last significantly longer than patent protection, as in the famous example of the long-secret formula for Coca-Cola. What the Supreme Court focused on in *Kewanee* was whether the existence of trade secret protection would provide a significant disincentive to patent, thereby impinging upon the congressional objective of encouraging public disclosure of important inventions and keeping them in the public domain. *Id.* at 484, 94 S.Ct. 1879. The Court concluded that whatever disincentives trade secret protection might provide were not significant enough to require federal preemption of the states' laws. The same type of analysis is helpful in deciding whether overriding federal policies require preemption of state contract law and a consequent refusal to enforce the Quick Point-Aronson bargain.

---

law in general; some of those questions were, of course, answered by *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). Appellant claims that this passage in *Lear* means states cannot protect owners of unpatented inventions in *all* circumstances and the Quick Point-Aronson contract

is one of them. It is self-evident that that argument assumes its own conclusion; analysis of underlying policies in *Kewanee* and other cases is the only way to determine whether the contract conflicts with federal law. *See* discussion at pages 765–767 of this opinion.

As to whether the contract here conflicts with the federal policy of leaving things in the public domain once they have become public, the answer seems obvious. Strangers to this contract have every right to copy the keyholder and they have done so. This distinguishes the situation from the problem involved by the enforcement of unfair competition laws faced in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *see Sinclair v. Aquarius Electronics, Inc., supra*, 184 USPQ at 686. The more difficult question is whether the enforcement of contracts such as this creates a significant disincentive to patent because, by extending a right to royalties beyond the duration of secrecy, the trade secret licensor insulates himself from the *effects* of public disclosure. *See* 74 *Harvard L.Rev.* 409, 411 (1960). Since a patent royalty agreement cannot extend beyond the patent's expiration date, *Brulotte v. Thys*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), the potential availability of a much longer royalty period through private agreement might make the latter alternative much more attractive.[9]

It would perhaps be sufficient for the purposes of this case to point out that the "disincentive" argument has little force where an unpatentable invention is involved, for there is no great federal interest in encouraging attempts to patent unpatentable subject matter, and only the slightest gain to be derived from increasing the number of applications on items of dubious patentability. *See Kewanee Oil Co. v. Bicron Corp., supra*, 416 U.S. at 484–89, 94 S.Ct. 1879. But even from a broader point of view, the disincentive argument is not particularly compelling. Although a trade secret licensor might well prefer to obtain a private agreement ensuring royalties for an extended time rather than to license a pat-

ent for 17 years, licensees are most apt to think differently. In other words, it is from the perspective of the bargaining situation that the risk of deterrence from patent application must be assessed, and in most cases the value of patent protection will be important enough to the licensee that the trade secret owner would not be able to extract a contract of indefinite duration beyond the point of secrecy, when other parties can copy the item royalty-free. Even in the instant case, where Quick Point for whatever reason agreed to such a contract, there was nevertheless every incentive for Aronson to patent. Quick Point would have paid much higher royalties for the patent period and Aronson would not have run the risk that Quick Point would cease manufacture and leave her with an unsellable idea, already copied by others. A well-known advocate of trade secret protection has expressed the distinctions between the interests sought to be served by patent law and those served by trade secret law, and has discussed the very issue present in this case:

> [T]he license reward for a trade secret tends to be a function of consideration for disclosure; for a patent, consideration for use * * *. Since a prospective trade secret licensee knows that his licensor cannot protect him from independent developers, he weighs the value of disclosure against the risks of relying on matter which is subject to third-party royalty-free use. Whether articulated or not, such balancing is the stuff that leads to hard negotiating for royalty rate and duration.

\* \* \* \* \* \*

In light of these distinctions, and the effect that they have on the bargaining between the parties, it is my view that

---

**9.** In addition to the danger that extended trade secret protection will cause a weakened incentive to patent, there may be another theory underlying this argument, namely, that freedom to contract should be circumscribed by a "trade secret misuse" doctrine just as it is circumscribed by the patent misuse doctrine expressed in *Brulotte v. Thys*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). I think it unnecessary to discuss this theory in much detail; the patent misuse doctrine is to prevent a party from using his extraordinary legislative grant of exclusivity as leverage to extend the benefits he has obtained. The trade secret owner has no such leverage; he cannot guarantee his licensees freedom from encroachment by others. *See* Milgrim, *Trade Secrets*, § 6.05[2][d] (1977).

the rights and duties bargained for and embodied in the trade secret license should govern. If a trade secret licensee does not elect to condition continuing royalty on continuing secrecy, we may assume that the value of immediate disclosure weighed heavily. It is no more appropriate for a court of law, after the fact, to renegotiate a trade secret license agreement when the subject matter becomes generally known than it is for a court to set aside a contract to purchase a house * * * where the purchaser could have driven a better bargain. Thus, leaving the parties where their bargain has placed them in a trade secret licensing context is not inconsistent with holding that a patent licensor may not require royalties beyond the life of the patent. Milgrim, "Sears to Lear to Painton: Of Whales and Other Matters," 46 *N.Y.U.L.Rev.* 17, 30, 31 (1971). *See also* Milgrim, *Trade Secrets,* § 6.05[2][d], § 6.05[4] (1977); *Sinclair v. Aquarius Electronics, Inc., supra.* I find that analysis persuasive.

In summary, the contract here was negotiated at arms length. There is no evidence of misrepresentation, bad faith, or inequality of bargaining power. Quick Point had the opportunity to assess its risks and took a gamble and has called upon the court for relief because it did not like the results. I conclude that no federal patent policies bar the enforcement of the contract according to its terms. Moreover, although I do not dismiss the possibility that a trade secret license can run afoul of the Sherman Act, I find nothing in this record that establishes an unreasonable restraint of trade as a result of this agreement. Finally, appellant's argument that it should be excused from performance because the purpose of the contract has been frustrated is wholly without merit.

I would affirm the district court.