# ARONSON *v.* QUICK POINT PENCIL CO.

No. 77–1413.   Argued December 6, 1978—Decided February 28, 1979

Burger, C. J., delivered the opinion of the Court, in which Brennan, Stewart, White, Marshall, Powell, Rehnquist, and Stevens, JJ., joined. Blackmun, J., filed an opinion concurring in the result, *post*, p. 266.

*C. Lee Cook, Jr.,* argued the cause for petitioner. With him on the briefs were *David C. Bogan, Robert S. Robin,* and *Robert E. Knechtel.*

*Erwin N. Griswold* argued the cause and filed a brief for respondent.

*Barry Grossman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield, Deputy Solicitor General Easterbrook, Stephen M. Shapiro,* and *Roger B. Andewelt.*[*]

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari, 436 U. S. 943, to consider whether federal patent law pre-empts state contract law so as to pre-

---

[*]*Ned L. Conley* filed a brief for the Patent, Trademark and Copyright Section of the State Bar of Texas as *amicus curiae* urging reversal.

*Edward S. Irons* and *Richard H. Stern* filed a brief for Ercon, Inc., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Tom Arnold* for the American Patent Law Assn.; and by *Leonard B. Mackey* and *Eugene L. Bernard* for the Licensing Executives Society (U. S. A.), Inc.

clude enforcement of a contract to pay royalties to a patent applicant, on sales of articles embodying the putative invention, for so long as the contracting party sells them, if a patent is not granted.

(1)

In October 1955 the petitioner, Mrs. Jane Aronson, filed an application, Serial No. 542677, for a patent on a new form of keyholder. Although ingenious, the design was so simple that it readily could be copied unless it was protected by patent. In June 1956, while the patent application was pending, Mrs. Aronson negotiated a contract with the respondent, Quick Point Pencil Co., for the manufacture and sale of the keyholder.

The contract was embodied in two documents. In the first, a letter from Quick Point to Mrs. Aronson, Quick Point agreed to pay Mrs. Aronson a royalty of 5% of the selling price in return for "the exclusive right to make and sell keyholders of the type shown in your application, Serial No. 542677." The letter further provided that the parties would consult one another concerning the steps to be taken "[i]n the event of any infringement."

The contract did not require Quick Point to manufacture the keyholder. Mrs. Aronson received a $750 advance on royalties and was entitled to rescind the exclusive license if Quick Point did not sell a million keyholders by the end of 1957. Quick Point retained the right to cancel the agreement whenever "the volume of sales does not meet our expectations." The duration of the agreement was not otherwise prescribed.

A contemporaneous document provided that if Mrs. Aronson's patent application was "not allowed within five (5) years, Quick Point Pencil Co. [would] pay . . . two and one half percent (2½%) of sales . . . so long as you [Quick Point] continue to sell same."†

---

†In April 1961, while Mrs. Aronson's patent application was pending, her husband sought a patent on a different keyholder and made plans to

In June 1961, when Mrs. Aronson had failed to obtain a patent on the keyholder within the five years specified in the agreement, Quick Point asserted its contractual right to reduce royalty payments to 2½% of sales. In September of that year the Board of Patent Appeals issued a final rejection of the application on the ground that the keyholder was not patentable, and Mrs. Aronson did not appeal. Quick Point continued to pay reduced royalties to her for 14 years thereafter.

The market was more receptive to the keyholder's novelty and utility than the Patent Office. By September 1975 Quick Point had made sales in excess of $7 million and paid Mrs. Aronson royalties totaling $203,963.84; sales were continuing to rise. However, while Quick Point was able to pre-empt the market in the earlier years and was long the only manufacturer of the Aronson keyholder, copies began to appear in the late 1960's. Quick Point's competitors, of course, were not required to pay royalties for their use of the design. Quick Point's share of the Aronson keyholder market has declined during the past decade.

(2)

In November 1975 Quick Point commenced an action in the United States District Court for a declaratory judgment, pursuant to 28 U. S. C. § 2201, that the royalty agreement was unenforceable. Quick Point asserted that state law which might otherwise make the contract enforceable was pre-empted by federal patent law. This is the only issue presented to us for decision.

---

license another company to manufacture it. Quick Point's attorney wrote to the couple that the proposed new license would violate the 1956 agreement. He observed that

"your license agreement is in respect of the disclosure of said Jane [Aronson's] application (not merely in respect of its claims) and that even if no patent is ever granted on the Jane [Aronson] application, *Quick Point Pencil Company is obligated to pay royalties in respect of any keyholder manufactured by it in accordance with any disclosure of said application.*" (Emphasis added.)

Both parties moved for summary judgment on affidavits, exhibits, and stipulations of fact. The District Court concluded that the "language of the agreement is plain, clear and unequivocal and has no relation as to whether or not a patent is ever granted." Accordingly, it held that the agreement was valid, and that Quick Point was obliged to pay the agreed royalties pursuant to the contract for so long as it manufactured the keyholder.

The Court of Appeals reversed, one judge dissenting. 567 F. 2d 757. It held that since the parties contracted with reference to a pending patent application, Mrs. Aronson was estopped from denying that patent law principles governed her contract with Quick Point. Although acknowledging that this Court had never decided the precise issue, the Court of Appeals held that our prior decisions regarding patent licenses compelled the conclusion that Quick Point's contract with Mrs. Aronson became unenforceable once she failed to obtain a patent. The court held that a continuing obligation to pay royalties would be contrary to "the strong federal policy favoring the full and free use of ideas in the public domain," *Lear, Inc.* v. *Adkins,* 395 U. S. 653, 674 (1969). The court also observed that if Mrs. Aronson actually had obtained a patent, Quick Point would have escaped its royalty obligations either if the patent were held to be invalid, see *ibid.,* or upon its expiration after 17 years, see *Brulotte* v. *Thys Co.,* 379 U. S. 29 (1964). Accordingly, it concluded that a licensee should be relieved of royalty obligations when the licensor's efforts to obtain a contemplated patent prove unsuccessful.

(3)

On this record it is clear that the parties contracted with full awareness of both the pendency of a patent application and the possibility that a patent might not issue. The clause de-escalating the royalty by half in the event no patent issued within five years makes that crystal clear. Quick Point apparently placed a significant value on exploiting the basic novelty

of the device, even if no patent issued; its success demonstrates that this judgment was well founded. Assuming, *arguendo,* that the initial letter and the commitment to pay a 5% royalty was subject to federal patent law, the provision relating to the 2½% royalty was explicitly independent of federal law. The cases and principles relied on by the Court of Appeals and Quick Point do not bear on a contract that does not rely on a patent, particularly where, as here, the contracting parties agreed expressly as to alternative obligations if no patent should issue.

Commercial agreements traditionally are the domain of state law. State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable; the states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law. *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U. S. 470, 479 (1974); see *Goldstein* v. *California,* 412 U. S. 546 (1973). In this as in other fields, the question of whether federal law pre-empts state law "involves a consideration of whether that law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941)." *Kewanee Oil Co., supra,* at 479. If it does not, state law governs.

In *Kewanee Oil Co., supra,* at 480–481, we reviewed the purposes of the federal patent system. First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

Enforcement of Quick Point's agreement with Mrs. Aronson is not inconsistent with any of these aims. Permitting inventors to make enforceable agreements licensing the use of their inventions in return for royalties provides an additional incentive to invention. Similarly, encouraging Mrs. Aronson

to make arrangements for the manufacture of her keyholder furthers the federal policy of disclosure of inventions; these simple devices display the novel idea which they embody wherever they are seen.

Quick Point argues that enforcement of such contracts conflicts with the federal policy against withdrawing ideas from the public domain and discourages recourse to the federal patent system by allowing states to extend "perpetual protection to articles too lacking in novelty to merit any patent at all under federal constitutional standards," *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225, 232 (1964).

We find no merit in this contention. Enforcement of the agreement does not withdraw any idea from the public domain. The design for the keyholder was not in the public domain before Quick Point obtained its license to manufacture it. See *Kewanee Oil Co., supra,* at 484. In negotiating the agreement, Mrs. Aronson disclosed the design in confidence. Had Quick Point tried to exploit the design in breach of that confidence, it would have risked legal liability. It is equally clear that the design entered the public domain as a result of the manufacture and sale of the keyholders under the contract.

Requiring Quick Point to bear the burden of royalties for the use of the design is no more inconsistent with federal patent law than any of the other costs involved in being the first to introduce a new product to the market, such as outlays for research and development, and marketing and promotional expenses. For reasons which Quick Point's experience with the Aronson keyholder demonstrate, innovative entrepreneurs have usually found such costs to be well worth paying.

Finally, enforcement of this agreement does not discourage anyone from seeking a patent. Mrs. Aronson attempted to obtain a patent for over five years. It is quite true that had she succeeded, she would have received a 5% royalty only on

keyholders sold during the 17-year life of the patent. Offsetting the limited terms of royalty payments, she would have received twice as much per dollar of Quick Point's sales, and both she and Quick Point could have licensed any others who produced the same keyholder. Which course would have produced the greater yield to the contracting parties is a matter of speculation; the parties resolved the uncertainties by their bargain.

### (4)

No decision of this Court relating to patents justifies relieving Quick Point of its contract obligations. We have held that a state may not forbid the copying of an idea in the public domain which does not meet the requirements for federal patent protection. *Compco Corp.* v. *Day-Brite Lighting, Inc.,* 376 U. S. 234 (1964); *Sears, Roebuck & Co.* v. *Stiffel Co., supra.* Enforcement of Quick Point's agreement, however, does not prevent anyone from copying the keyholder. It merely requires Quick Point to pay the consideration which it promised in return for the use of a novel device which enabled it to pre-empt the market.

In *Lear, Inc.* v. *Adkins,* 395 U. S. 653 (1969), we held that a person licensed to use a patent may challenge the validity of the patent, and that a licensee who establishes that the patent is invalid need not pay the royalties accrued under the licensing agreement subsequent to the issuance of the patent. Both holdings relied on the desirability of encouraging licensees to challenge the validity of patents, to further the strong federal policy that only inventions which meet the rigorous requirements of patentability shall be withdrawn from the public domain. *Id.,* at 670–671, 673–674. Accordingly, neither the holding nor the rationale of *Lear* controls when no patent has issued, and no ideas have been withdrawn from public use.

Enforcement of the royalty agreement here is also consistent with the principles treated in *Brulotte* v. *Thys Co.,* 379 U. S. 29 (1964). There, we held that the obligation to pay

royalties in return for the use of a patented device may not extend beyond the life of the patent. The principle underlying that holding was simply that the monopoly granted *under a patent* cannot lawfully be used to "negotiate with the leverage of that monopoly." The Court emphasized that to "use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent. . . ." *Id.*, at 33. Here the reduced royalty which is challenged, far from being negotiated "with the leverage" of a patent, rested on the contingency that no patent would issue within five years.

No doubt a pending patent application gives the applicant some additional bargaining power for purposes of negotiating a royalty agreement. The pending application allows the inventor to hold out the hope of an exclusive right to exploit the idea, as well as the threat that the other party will be prevented from using the idea for 17 years. However, the amount of leverage arising from a patent application depends on how likely the parties consider it to be that a valid patent will issue. Here, where no patent ever issued, the record is entirely clear that the parties assigned a substantial likelihood to that contingency, since they specifically provided for a reduced royalty in the event no patent issued within five years.

This case does not require us to draw the line between what constitutes abuse of a pending application and what does not. It is clear that whatever role the pending application played in the negotiation of the 5% royalty, it played no part in the contract to pay the 2½% royalty indefinitely.

Our holding in *Kewanee Oil Co.* puts to rest the contention that federal law pre-empts and renders unenforceable the contract made by these parties. There we held that state law forbidding the misappropriation of trade secrets was not pre-empted by federal patent law. We observed:

"Certainly the patent policy of encouraging invention is not disturbed by the existence of another form of

incentive to invention. In this respect the two systems [patent and trade secret law] are not and never would be in conflict." 416 U. S., at 484.

Enforcement of this royalty agreement is even less offensive to federal patent policies than state law protecting trade secrets. The most commonly accepted definition of trade secrets is restricted to confidential information which is not disclosed in the normal process of exploitation. See Restatement of Torts § 757, Comment *b*, p. 5 (1939). Accordingly, the exploitation of trade secrets under state law may not satisfy the federal policy in favor of disclosure, whereas disclosure is inescapable in exploiting a device like the Aronson keyholder.

Enforcement of these contractual obligations, freely undertaken in arm's-length negotiation and with no fixed reliance on a patent or a probable patent grant, will

"encourage invention in areas where patent law does not reach, and will prompt the independent innovator to proceed with the discovery and exploitation of his invention. Competition is fostered and the public is not deprived of the use of valuable, if not quite patentable, invention." (Footnote omitted.) 416 U. S., at 485.

The device which is the subject of this contract ceased to have any secrecy as soon as it was first marketed, yet when the contract was negotiated the inventiveness and novelty were sufficiently apparent to induce an experienced novelty manufacturer to agree to pay for the opportunity to be first in the market. Federal patent law is not a barrier to such a contract.

*Reversed.*

MR. JUSTICE BLACKMUN, concurring in the result.

For me, the hard question is whether this case can meaningfully be distinguished from *Brulotte* v. *Thys Co.,* 379 U. S. 29 (1964). There the Court held that a patent licensor could not use the leverage of its patent to obtain a royalty contract

that extended beyond the patent's 17-year term. Here Mrs. Aronson has used the leverage of her patent application to negotiate a royalty contract which continues to be binding even though the patent application was long ago denied.

The Court, *ante,* at 265, asserts that her leverage played "no part" with respect to the contingent agreement to pay a reduced royalty if no patent issued within five years. Yet it may well be that Quick Point agreed to that contingency in order to obtain its other rights that depended on the success of the patent application. The parties did not apportion consideration in the neat fashion the Court adopts.

In my view, the holding in *Brulotte* reflects hostility toward extension of a patent monopoly whose term is fixed by statute, 35 U. S. C. § 154. Such hostility has no place here. A patent application which is later denied temporarily discourages unlicensed imitators. Its benefits and hazards are of a different magnitude from those of a granted patent that prohibits all competition for 17 years. Nothing justifies estopping a patent-application licensor from entering into a contract whose term does not end if the application fails. The Court points out, *ante,* at 263, that enforcement of this contract does not conflict with the objectives of the patent laws. The United States, as *amicus curiae,* maintains that patent-application licensing of this sort is desirable because it encourages patent applications, promotes early disclosure, and allows parties to structure their bargains efficiently.

On this basis, I concur in the Court's holding that federal patent law does not pre-empt the enforcement of Mrs. Aronson's contract with Quick Point.