INDUSTRIAL PROMOTION COMPANY, Amplon Import & Export, Ltd., and Theo L. Vinke, Plaintiffs-Respondents,†

v.

VERSA PRODUCTS, INC., Defendant-Appellant.

Court of Appeals

*No. 90-1428. Submitted on briefs December 4, 1990.—Decided February 19, 1991.*

(Also reported in 467 N.W.2d 168.)

† Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *John H. Lindquist* and *Gregg J. Gunta* of *von Briesen & Purtell, S.C.,* of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the briefs of *Mia Sefarbi* and *Robert A. Levine* of *Levine & Epstein,* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J.  Versa Products, Inc. (Versa), a licensee, appeals from a judgment following a trial to the court awarding Industrial Promotion Company (IPC), the licensor, 4.4% of the net sales of ladders manufactured by Versa, and 3.5% of the net sales of ladders purchased and resold by Versa from February 22, 1989,

until August 5, 1992. This award was based on the language of a contract between these two parties. However, products subject to the contract were patented and these patents expired February 22, 1989. The conflict between the contract expiration date, August 5, 1992, and the patent expiration date, February 22, 1989, is the center of this dispute.

The contract at issue is a hybrid agreement providing for royalties under a patent and a "know-how" or trade secret license.[2] The contract was entered into by IPC and Versa on August 5, 1983, and specified a term of nine years, ending August 5, 1992. The three patents involved under this hybrid agreement expired February 22, 1989. The basic issue in the trial court and on appeal is whether the continuing royalty obligations of the hybrid license agreement remain enforceable after the expiration of the licensed patents.[3] The determination of this issue turns on whether state law or federal patent law is applied. The trial court found state contract law applied and enforced the terms of the contract. We disagree and hold that federal patent law supersedes state contract law in a hybrid license contract affecting U.S. patent rights.

The trial court, by enforcing the terms of the contract until August 5, 1992, effectively extended the patent license agreement beyond the terms of the patent. This extension occurs because the contract contains no allocation of royalties between the patents and the

[2]Interchangeability of trade secrets and know-how was recognized in *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1367 n.4 (11th Cir. 1983).

[3]The royalty obligations due under the agreement prior to the expiration of the patents are not at issue.

know-how license. The hybrid agreement between the parties in relevant part follows.

## EXCLUSIVE PATENT LICENSE AGREEMENT

. . ..

### RECITALS:[4]

WHEREAS, Sacome International is the owner of letters patent of the United States numbers 3,643,292; 3,849,834, and 3,879,146 for an automatically interlockable hinge fitting, lockable hinge joint and joint respectively issued on February 22, 1972, November 26, 1974, and April 22, 1975, respectively to Otto Mayer, Plauderhausen, West Germany (hereinafter referred to as the "Invention"); and

WHEREAS, IPC has represented to Versa that it has the exclusive rights to these patents for the United States of America, Canada, and Mexico; and

WHEREAS, IPC is willing to grant to Versa the exclusive right to manufacture, use, market, and sell the products using the patented items as integral parts, thereof; and

WHEREAS, Sacome International agrees to countersign and fully guarantee any and all agreements or obligations of IPC as contained in this Agreement.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, the parties hereto intending to be legally bound hereby, agree as follows:

. . ..

3. (a) Sacome International hereby grants to Versa the right to manufacture Sacome International's

---

[4]Recital 3(b) is the "know-how" portion of the agreement.

919

standard related catalog items. Sacome International agrees to furnish confidential technical information, data, drawings, and the specifications needed to manufacture Sacome International's standard related catalog items. Sacome International further agrees to provide the same data to manufacture the hinges after a minimum of One Million hinges have been bought by Versa should Versa, at its sole discretion, thereafter decide to manufacture the hinges.

(b) Any change, improvement, redesigning or alteration of the patented items covered by this Agreement and manufacturing knowhow shall be exchanged between all parties of this Agreement including Sacome International and its assigns, and is included in the exclusive license granted hereunder.

. . ..

5. (a) The term of this Agreement shall be for nine (9) years from the date hereof.

If the royalties were allocated between the patents and the know-how, the patent royalties would expire with the patents on February 22, 1989, and the know-how license royalties would expire under the contract on August 5, 1992. Because the contract fails to allocate and because the contract royalties cannot be split, the contract is subject to the superseding relevant federal patent law, making the hybrid license agreement unenforceable beyond the expiration date of the patents. *Pitney Bowes,* 701 F.2d at 1372–73; *see also Brulotte v. Thys Co.,* 379 U.S. 29 (1964).

IPC argues and the trial court agreed that *Brulotte* is distinguishable and that the controlling case is *Aronson v. Quick-Point Pencil Co.,* 440 U.S. 257 (1979). *Aronson* is not controlling in this case. While it is true that the Supreme Court in *Aronson* held that federal

patent law does not preempt state trade secret law, the facts in *Aronson* have one fatal flaw—no patent was ever issued for the product. However, even if we chose to apply *Aronson*, the outcome would be the same—all royalties terminate when the patent period ends. The contract in *Aronson* provided for two different percentage royalties, one under the patent and another if a patent did not issue. Citing *Brulotte,* the Eighth Circuit Court of Appeals observed that had a patent issued, the entire royalty obligation would have ceased at the completion of the seventeen-year patent term, notwithstanding the terms of the agreement. *Quick-Point Pencil Co. v. Aronson,* 567 F.2d 757, 762 (8th Cir. 1977). Although the Supreme Court reversed the Eighth Circuit, its holding limited the application of state trade secret law to situations where a patent did not issue. The Court specifically noted the Eighth Circuit's *Brulotte*-based conclusion, *Aronson* 440 U.S. at 261, and at a later point in its decision agreed that if a patent had issued, all royalty obligations would have ceased after seventeen years. *Id.* at 263–65.

IPC misconstrues as controlling both *Aronson* and another case, *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974). While it is true that both of these cases support the enforcement of state trade secret law against claims of federal preemption, IPC's reliance is flawed for two reasons. As noted, no patent ever issued in *Aronson* and in *Kewanee,* no patent was ever applied for. Second and more importantly, this is not a preemption issue but rather a supremacy conflict. "When a patent issues [as in this case], the potential exists for direct conflict between federal patent law and state trade secret law. When such a conflict occurs, the question is no longer one of federal preemption; it is instead one of federal supremacy."

*Pitney Bowes,* 701 F.2d at 1372 and n.12. Footnote 12 in *Pitney Bowes* states:

> This does not mean that parties cannot agree to license both trade secrets and patent rights on patents actually issued. As the Court in *Kewanee* noted, the purposes of patent protection and trade secret protection usually are entirely different, and the enforcement of trade secrets need not necessarily undermine federal patent policy. *See* 416 U.S. 479–93, 94 S.Ct. at 1885–1892. But if and when their purposes conflict directly, federal supremacy requires that federal patent law determine the rights under the agreement.
>
> Pitney Bowes does *not* contend that all hybrid agreements providing for post-patent-expiration payments necessarily raise a direct conflict with federal patent laws. Instead, it argues that the defect in the Vertical Collator Agreement is its failure to allocate payments between trade secrets and patent rights. Citing *Veltman v. Norton Simon, Inc.,* 425 F.Supp. 774, 776 (S.D.N.Y. 1977), it suggests that, had the parties to the agreement undertaken such an allocation, reduced payments for trade secrets after the patents expired might not have directly conflicted with federal patent law and therefore might have been permissible. The district court seems to have adopted this view. *See* 517 F.Supp. at 61 & n.19, 63. *See also Modrey v. American Gage & Machine Co.,* 339 F.Supp. 1213, 1217–18 (S.D.N.Y. 1972) (agreement providing for reduced royalties of 3% after patent expires does not violate *Brulotte*). In light of our conclusion *infra* that the Vertical Collator Agreement violates federal patent law, and the fact that there is no allocation in the agreement, we need not decide whether allocation—or some other provision—would have rendered it enforceable. Indeed, the Supreme Court has never addressed the question

whether a hybrid agreement in which patents issue can ever survive the expiration of the patents. The court in *Brulotte,* however, applied a *per se* rule to agreements containing the same terms before and after the patent expires because it was "unable to conjecture what the bargaining position of the parties might have been" had no patent been involved. 379 U.S. at 32, 85 S.Ct. at 179. The implication of this language is that, if a patent owner can prove that he did not use his patent monopoly leverage to exact reduced post-expiration trade secret payments, then there would be no direct conflict with federal law and the agreement would be enforced.

*Id.* at 1372–73.

■■

We agree with the analysis set forth in this footnote from *Pitney Bowes.* As in *Brulotte,* we have no way to determine what would have happened between these parties if no patents were involved. IPC argues that because Versa's counsel drafted the agreement and Versa was well-advised throughout the negotiations, Versa was in an equal bargaining position and not subject to the patent monopoly leverage, an underlying concern with hybrid agreements. This argument is not supported by evidence in the record. First, since the patents were in existence at the time the agreement was entered into, there is no conclusive way to determine if patent monopoly leverage was a factor. Second, because there is no distinction and no reduction or any change in patent royalties as distinguished from compensation for know-how, the contract rights cannot be distinguished from the patent rights, and under federal patent law, the agreement is *per se* invalid. *See Brulotte,* 379 U.S. at 32. To be innocent of patent misuse or even the perception of misuse, the agreement must clearly distinguish

between payments for trade secrets and patent royalties. *Id.; see also Meehan v. PPG Indus., Inc.,* 802 F.2d 881, 885 (7th Cir. 1986). Without the allocation of royalties, this contract is an unlawful extension of patent monopoly. This failure to allocate is fatal to the recovery of royalties after the expiration of the patents.

*By the Court.*—Judgment reversed and cause remanded.

FINE, J. *(dissenting).* Versa Products appeals from a judgment enforcing a patent-license agreement between Versa and Industrial Promotion Company through the agreement's expiration date of August 5, 1992. The underlying patents expired on February 22, 1989. Versa contends that the patents' expiration renders the agreement unenforceable. The majority accepts Versa's contention. I respectfully dissent because the facts of this case, as found by the trial court, show that there was no patent-misuse. Accordingly, the patent-license agreement should be enforced.

## I.

In 1964, the United States Supreme Court ruled that a patentee could not leverage its patent in order to extend the patent monopoly beyond the patent's term. *Brulotte v. Thys Co.,* 379 U.S. 29 (1964). *Brulotte* held certain royalty agreements to be unenforceable because they were "on their face a bald attempt" to use the patent monopoly to secure a stream of royalties beyond the patent term, and because the Court was "unable to conjecture what the bargaining position of the parties might have been" absent the patent leverage. *Id.,* 379 U.S. at 32. Four and one-half years later, the Court held that conditioning a patent license on the payment of

royalties for the use, sale, or manufacture of unpatented products was, under the circumstances, also patent-misuse and unlawful. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 135 (1969). *Zenith,* however, stressed that the key was patent leverage: the patentee's use of "the power of his patent to insist on a total-sales royalty and override protestations of the licensee that some of his products are unsuited to the patent or that for some lines of his merchandise he has no need or desire to purchase the privileges of the patent." *Id.,* 395 U.S. at 139. Thus, the Court emphasized that parties to a patent-licensing agreement *could* structure their agreement so as to require royalty payments to be calculated as a percentage of total sales even if none of the products sold used the patents for which the royalties were paid as long as this was for the "convenience of the parties" and not dictated by "patent power." *Id.,* 395 U.S. at 138; *see also Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 834 (1950) ("sound business judgment" and "convenience" may warrant "payment of royalties according to an agreed percentage of the [patent] licensee's sales" even though these sales encompass non-patented products—as long as the patent monopoly is not thereby extended), *overruled on other grounds, Lear, Inc. v. Adkins,* 395 U.S. 653, 671 (1969). Commenting on the *Brulotte* situation, *Zenith* accordingly recognized that it would be lawful for parties to a patent-licensing agreement to amortize royalties beyond the patent term as long as the post-expiration payments were for pre-expiration use. *Zenith,* 395 U.S. at 136.

Justice John Marshall Harlan, who dissented in *Brulotte,* 379 U.S. at 34, also dissented in part in *Zenith,* 395 U.S. at 141. He was concerned that the emphasis on actual patent-misuse would bring uncertainty because it required "subsequent judicial examination of the parties'

negotiations." *Id.,* 395 U.S. at 142. "In practice," Justice Harlan complained, "it often will be very hard to tell whether a license provision was included at the instance of both parties or only at the will of the licensor." *Id.,* 395 U.S. at 141. Despite these misgivings, *Zenith* remains the law.[1] *Zenith's* holding that, absent actual patent-misuse, parties to a patent-license agreement may structure that agreement for their "convenience" requires that we affirm the trial court—given the trial court's specific findings that there was no patent-misuse here.[2]

## II.

A. <u>Background.</u> On August 5, 1983, Industrial Promotion, as assignee of exclusive rights for the United States, Canada, and Mexico in three patents dealing with ladder hinges, granted to Versa for a term of nine years the exclusive right to "buy, manufacture, use, market, and sell" the patents and "products containing" the patents in those countries. Sacome International, owner of the patents, was also a party to the contract.

In return for the rights granted under the August 5, 1983, contract, which, as the majority opinion points out, also encompassed "know-how," Versa agreed to pay Industrial Promotion license fees, which the trial court found amounted to a "4.4%" royalty.

---

[1] Oddly, the majority opinion ignores *Zenith,* which it does not even cite.

[2] This case was tried to the court. Yet, despite *Zenith's* crucial focus on the parties' intent, the majority opinion wholly ignores the trial court's findings of fact on that issue. The trial court's findings may not, of course, be set aside unless they are "clearly erroneous." Rule 805.17(2), Stats. In this case, they are amply supported by the evidence adduced at trial.

Although the August contract encompassed both patent rights and know-how and was therefore a "hybrid" agreement, it did not apportion royalty payments between the patent rights and the know-how, and did not provide for a reduction in royalty payments following the patents' expiration. Although the patents expired on February 22, 1989, this was not mentioned in the contract.

B. The Trial Court's Findings of Fact. As noted earlier in part I, before a patent-license agreement may be invalidated because of patent-misuse, there must be actual misuse—that is, the patentee/licensor must have used patent-monopoly leverage to exact royalties or other consideration for permission to use, sell, or manufacture either unpatented products or products whose patent protection has expired. Thus, as *Zenith* indicates, and Justice Harlan's dissent underscores, intent is crucial. *Id.,* 395 U.S. at 138, 141–142.

Following a trial to the court, the trial court here found that at the time they signed the August 5, 1983, contract, both Industrial Promotion and Versa knew that the patents would expire on February 22, 1989. Additionally, the trial court found that the August 5, 1983, contract "was prepared by [Versa]'s attorney . . ., who modified the terms and conditions" of a proposed agreement that had been prepared by Industrial Promotion.[3] This proposed agreement was, with some differences not at issue on this appeal, essentially similar to the August 5, 1983, contract *except:*

> —The duration of the agreement proposed by Industrial Promotion was specifically limited to "the term for which [the patents] were granted." In con-

[3] As already indicated, Industrial Promotion had the rights to the patents at issue and licensed them to Versa.

trast, the August 5, 1983, contract drafted by Versa had a nine-year term that exceeded the patents' life by some three and one-half years.

—The agreement proposed by Industrial Promotion provided for a license fee of *seven and one-half percent* of Versa's "net sales of all items including the patented hinges such as but not limited to folding ladders." In contrast, the August 5, 1983, contract, which was to run for a longer term than the original proposal, provided for a license fee rate that was significantly lower.[4]

The trial court found as a fact that the extension of the contract term to August 5, 1992, from one that was coterminous with the life of the patents, was at the request of *Versa,* the licensee, and not Industrial Promotion, the licensor, because Versa, as found by the trial court, "wanted to recoup its start-up costs and the benefit of the continuing know-how license."

The trial court's findings of fact are fully supported by the record and are not by any stretch of the imagination "clearly erroneous." *See* Rule 805.17(2), Stats. They are, accordingly, binding on us. *See ibid.* In light of these findings, the majority applies a rule that has no application here. *See Zenith,* 395 U.S. at 133–140. I would affirm.

---

[4]Nine years at the "4.4%" rate found by the trial court is a little less than the seven and one-half percent rate for the five and one-half years that would have been the effective term of the proposed agreement drafted by Industrial Promotion had it been executed on August 5, 1983.