THE ADMINISTRATORS OF THE
TULANE EDUCATIONAL
FUND

v.

DEBIO HOLDING, S.A., Debiopharm,
S.A., Debiotech, S.A., and Debio Re-
cherche Pharmaceutique, S.A.

No. 99–2207.

United States District Court,
E.D. Louisiana.

Oct. 24, 2001.

Stephen G. Bullock, Phillip A. Wittmann, Christopher A. Colvin, Stone, Pigman, Walther, Wittman & Hutchinson, LLP, New Orleans, LA, Eugene Moroz, William S. Feiler, Michael P. Dougherty, Mochael O. Cummings, Morgan & Finnegan, LLP, New York, NY, for plaintiff.

Russ M. Herman, Sidney A. Cotlar, Brian David Katz, Herman, Herman, Katz & Cotlar, LLP, New Orleans, LA, Michael E. Ray, Christopher G. Daniel, David H. Read, Womble, Carlyle, Sandridge & Rice, PLLC, Winston-Salem, NC, Mary Margaret Hogans, Mark Fox Evens, Mark J. Riedy, Christopher Kaiser, Thelen, Reid & Priest Law Firm, Washington, DC, Nicholas Peter Kostopulos, Womble, Carlyle, Sandridge & Rice, Washington, DC, Judy Jarecki-Black, Womble, Carlyle, Sandridge & Rice, Atlanta, GA, for defendants.

## ORDER AND REASONS

BARBIER, District Judge.

Plaintiff, the Administrators of the Tulane Educational Fund ("Tulane"), filed this suit, claiming in part that Defendants, Debio Holding S.A., Debiopharm S.A., Debiotech S.A., and Debio Recherche Pharmaceutique S.A., have refused to pay royalties on sales of two pharmaceutical products—"Decapeptyl Acetate" and "Decapeptyl Pamoate"—as required by the parties' patent license agreement and a subsequent letter agreement.

Presently before the Court are the parties' cross motions for partial summary judgment (Rec. Docs. 74 and 79). The Court heard oral argument on the motions on October 17, 2001. Having considered the evidence submitted by both sides, the various memoranda, and the applicable law, the Court concludes, for the reasons that follow, that Plaintiff's motion (Rec. Doc. 74) should be **DENIED** and Defendants' motion (Rec.Doc. 79) should be **GRANTED**.

## BACKGROUND

In the early 1970's, Dr. Andrew V. Schally led a research team at Tulane University Medical Center that developed a modified LH–RH molecule, given the generic name "triptorelin," and marketed for pharmaceutical use under the trademark "Decapeptyl."[1] On March, 12, 1982, Tulane licensed its triptorelin technology to Defendant Debiopharm, a drug development headquartered in Lausanne, Switzerland. The patent license agreement ("1982 Agreement") gave Debiopharm (1) an exclusive license under any patents issuing from eleven foreign and three United States patent applications directed to triptorelin technology and (2) the exclusive right to make, use, and sell products covered by those patents throughout the world.

---

1. "LH–RH" is a hormone called luteinizing hormone releasing hormone, which has important diagnostic and therapeutic functions. *See* Complaint, ¶ 11–14. Natural LH–RH is a decapeptide, or a chain of ten amino acids. *Id.* The Tulane research team first isolated the LH–RH hormone and then discovered that changing the sixth amino acid in the chain created a more active and longer-lasting LH–RH molecule, thereby creating the modified LH–RH molecule known as "triptorelin." *Id.*

The 1982 Agreement provided that Debiopharm would pay royalties on sales of triptorelin products throughout the world on a country-by-country basis. The Agreement specified two different royalty rates: a 6% royalty rate on net sales in countries where a licensed patent was in force; and a 3% rate where no patent was in force. In 1987, the parties became engaged in a dispute over the applicable royalty rate for sales of a new triptorelin product.[2] The parties resolved the issue in 1988, when Tulane agreed by letter to reduce the royalty on all sales of Decapeptyl Acetate to the non-patent rate of 3%, in return for Debiopharm agreeing to pay a 3% royalty on net sales of the new version of the product, Decapeptyl Pamoate, for ten years from the date of the first commercial sale in each country where the product was sold ("1988 Letter Agreement"). The United States patents licensed to Debiopharm under the agreements expired in 1994. During oral argument, counsel for Debiopharm represented that all foreign patents, excepting the French patent, have expired as well.

Tulane sued Defendants, alleging in part that Debiopharm has not complied with its royalty obligations under the 1982 Agreement or the 1988 Letter Agreement. Defendants assert in their Fourteenth Affirmative Defense that the agreements are unenforceable to the extent they provide for any post-expiration patent royalties, under the Supreme Court's decision in *Brulotte v. Thys Company*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964).[3]

Defendants move for partial summary judgment that, as a matter of law, Plaintiff is not entitled to pursue any claim to recover royalties or other relief for product sales in any country after the date of the expiration of Plaintiff's patent in that country. (Rec.Doc. 79). Plaintiff moves for partial summary judgment that Defendant's Fourteenth Affirmative Defense is meritless, as a matter of law, because the Supreme Court's decision in *Brulotte* does not apply to the parties' agreement with respect to foreign patents and that the 1988 Letter Agreement is unambiguous and, as a matter of law, requires Debiopharm to pay royalties on Decapeptyl Pamoate for ten years from the date of first commercial sale in a country, without regard to the existence or expiration of any Tulane patent. (Rec.Doc. 74).

## DISCUSSION

Under Rules 56(c) and (d) of the Federal Rules of Civil Procedure, a party

---

**2.** While Tulane developed the triptorelin technology, Debiopharm developed the pharmaceutical products using triptorelin as an active ingredient. Four years after the parties entered into the 1982 Agreement, Debiopharm developed a commercially feasible sustained-release delivery system for triptorelin, or an acetate-based sustained delivery system. Sales of the product in the acetate form commenced in 1986. In 1996, Debio R.P. developed a pamoate-based sustained-release delivery system. Both products are sold principally under the trademark "Decapeptyl."

Plaintiff alleges that the dispute between the parties began in 1987, when Debiopharm refused to pay the 6% royalty in countries where a patent existed, asserting that the li-

censed patents were not effective as the delivery system used in the Decapeptyl acetate product was subject to an infringement claim by a third party. (Rec. Doc. 74, at 4).

**3.** Defendant's Fourteenth Affirmative Defense states:

The subject license agreements or provisions thereof are, under the interpretations proffered by Tulane, void, unenforceable or otherwise limited on the grounds of illegality or as against public policy, including the policy set forth by the Supreme Court in its decision in *Brulotte v. Thys*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), its progeny and relevant competition law, if any, of the European Commission.

is entitled to summary judgment if it can establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Where the only issue before the Court is a pure question of law, summary judgment is proper. *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir.1991).

■■■ Additionally, in cases involving contract interpretation, summary judgment is appropriate if the contract in question is unambiguous and can be given a certain or definite legal meaning or interpretation. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir.1992). Where a contract "admits of only one reasonable interpretation," it is unambiguous. *United Mine Workers of America v. Pittston*, 984 F.2d 469, 473 (D.C.Cir.1993).[4]

■■■ However, where a contract permits of two reasonable constructions, the contract is deemed ambiguous and summary judgment is inappropriate because the proper interpretation becomes a question of fact. *D.E.W., Inc.*, 957 F.2d at 199. In interpreting an ambiguous contract, a court may consider affidavits and other extrinsic evidence in order to ascertain the intent of the contracting parties. *Pittston*, 984 F.2d at 473. Finally, it is a well-established principle of contract interpretation that ambiguous provisions of an agreement be construed against the drafter. *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 327 (D.C.Ct.App.2001).

## I. Defendants Motion for Partial Summary Judgment

Defendants make two arguments as to why Plaintiff cannot recover any post-expiration patent royalties: (1) the 1982 Agreement between the parties explicitly provides for the payment of royalties only for the lifetime of a patent where one issues; (2) the Supreme Court's holding in *Brulotte* prohibits any such recovery. The Court agrees with both of Defendants' arguments.

### A. 1982 License Agreement

■■■ Section 3(b) of the 1982 Agreement explicitly states that payment of royalties will be on a country-by-country basis and will continue "for a period equivalent to the life of the Licensed Patent ... or *in those countries where no patent exists* for a period of ten (10) years commencing at the time of first commercial sale of Products or Combination Products by DEBIOPHARM in the particular country." (Rec.Doc. 74, Exh. 1) (emphasis added). Defendants argue that this clear and unambiguous language provides that Debiopharm would pay royalties either for ten years if no patent issued, or for a period of time equivalent to the life of a patent.

Plaintiff, however, attempts to interpret this provision as meaning royalties will be due in a country where a patent issues for a period equivalent to the life of the patent or ten years from the date of first commercial sale, *whichever period is longer*. Plaintiff notes that the kind of "hybrid language" used in the 1982 Agreement is commonly used to provide for a minimum of ten years of royalty payments in licensing agreements. In support of its contention, Tulane points to similar provisions used by Debiopharm itself in sublicense agreements under the 1982 Agreement. However, those provisions quoted by Tulane in its memorandum specifically provide that the period of royalties will be "for a period of ten (10) years from the

---

**4.** The parties agree that D.C. law governs the issues of contract construction under the choice of law provision in the 1982 Agreement.

first commercial sale ... or for a period ending with the last of the issued Patents relating to the country concerned, *whichever period is longer.*" (Rec. Doc. 82, at 9–10) (emphasis added). There is no such language in the 1982 Agreement between Debiopharm and Tulane.

Moreover, the Court finds that Plaintiff's interpretation runs directly contrary to the contract language. As Defendants argue, "[t]here is absolutely nothing in the 1982 Agreement to suggest that the ten year period can be superimposed upon a patent country once the patent in that country expires." (Rec. Doc. 79, at 8). According to the plain language of Section 3(b), Debiopharm's royalty obligations on sales in a country that issued a triptorelin patent terminate when the patent expires. As for royalties due from sales in countries where no patent issued, Defendants do not dispute that Plaintiff is entitled to payment of royalties for a period of ten years commencing at the time of the first commercial sale by Debiopharm in the particular country, pursuant to the 1982 Agreement.

### B. *Brulotte*

■ While the Court finds that, as a matter of law, the 1982 Agreement does not provide for post-expiration royalty payments, the Court also agrees with Defendants that, even if the 1982 Agreement did provide for such royalties, the Supreme Court's holding in *Brulotte v. Thys Company*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), prohibits Tulane from recovering royalties in countries where a patent issues once the patent expires.

In *Brulotte,* the plaintiff, who owned various patents for hop-picking, licensed a hop-picking machine to the defendants. 379 U.S. at 29–30, 85 S.Ct. at 177. Under the licenses, royalties were due for a term that extended beyond the expiration date of the patents. The plaintiff filed suit against the defendants for refusing to make royalty payments accruing both before and after the expiration date of the patents. The defendants argued that the plaintiff had misused the patents through extension of the license agreements beyond the expiration date of the patents. *Id.*

The Supreme Court agreed with the defendants that no royalties could be collected which accrued after the last of the patents incorporated into the machines had expired. *Brulotte,* 379 U.S. at 30, 85 S.Ct. at 178. The Court explained that, while the patentee may grant or confer the right to sell and to use the property during the lifetime of the patent, once the patent expires, those rights become public property. *Id.* at 31, 85 S.Ct. at 178 (citations omitted) (quoting *Adams v. Burke,* 84 U.S. 453, 17 Wall. 453, 456, 21 L.Ed. 700).

The Supreme Court additionally noted that the licenses involved in *Brulotte* drew no line between the term of the patent and the post-expiration period, i.e., that the same royalty and use provisions were applicable to both periods. *Id.* at 32, 85 S.Ct. at 179. The Court found that the contracts were, "therefore, on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period." *Id.* Expressing concern with respect to the patentee's ability under such circumstances to use the patents as leverage to obtain unfair rates for post-expiration royalties and how such arrangements would affect the free market, the Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." *Id.*

Plaintiff argues that the Supreme Court's decision in *Brulotte* does not address or apply to the parties' agreements to pay royalties on sales of the products in

foreign countries in the instant case. Rather, Plaintiff urges that *Brulotte* is concerned only with the improper extension of United States patents and the effects of such extensions on United States commerce. *Brulotte*, Plaintiff argues, "does not control what parties may or may not agree to regarding royalties on sales in foreign countries." (Rec. Doc. 74, at 7).

Alternatively, Plaintiff asserts that, even if *Brulotte* applies to royalties for foreign sales, the agreements in the instant case do not violate *Brulotte*'s holding. Plaintiff contends that *Brulotte* only applies to patent licenses, and the parties' 1988 Letter Agreement on Decapeptyl Pamoate is not a patent license. Plaintiff's argument is that the 1988 Letter Agreement evidences a separate contract validly entered into by the parties for royalties on sales of the "new product"—Decapeptyl Pamoate—for a ten year period in any country where it is sold, without reference or regard to any patent, the expiration of any patent, or the cessation of royalty payments upon the expiration of any patent.

Finally, Plaintiff argues that the agreements in dispute here are more similar to those in *Aronson v. Quick Point Pencil Company*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), than to the license agreements in *Brulotte*. In *Aronson*, while a patent was pending on a keyholder designed by the plaintiff, the plaintiff entered into a contract with the defendant granting the exclusive right to make and sell the keyholder in return for a 5% royalty on the selling price of each product. *Id.* at 259, 99 S.Ct. at 1097–98. If the patent was not allowed within five years, the royalty was to be reduced to 2½%. *Id.* Subsequently, the patent application was rejected. *Id.* The defendant paid royalties to the plaintiff for a number of years following the rejection of the patent application, then filed suit seeking a declaratory judg-

ment that federal patent law applied to the agreement and that the continuing obligation to pay royalties was contrary to the federal policy in favor of the full and free use of ideas in the public domain. *Id.*

After reviewing federal patent law policies, the Supreme Court upheld the agreement as one for the sale of a generic trade secret, governed by state trade secret provisions. *Id.* at 263, 99 S.Ct. at 1099–1100. The Court found that the defendant's obligation to make continuing royalty payments was a reasonable quid pro quo for the privilege of introducing a new product to the market. *Id.* However, the Court emphasized that its decision was based on the facts that: (1) no patents ever issued on the design; (2) the parties contracted with the full awareness of both the pendency of a patent application and the possibility that a patent might not issue; and (3) the parties fully considered the contingency of the patent issuing, since they specifically provided for a reduced royalty in the event no patent issued. *Id.* at 261–65, 99 S.Ct. at 1099–1101. The Court concluded that *Brulotte* did not apply, because the reduced royalty rate being challenged was not negotiated with the leverage of a patent, but "rested on the contingency that no patent would issue within five years." *Id.* at 265, 99 S.Ct. at 1100.

Plaintiff in the instant case argues that similarly there was clearly no "leverage" afforded the Plaintiff by the existence of a patent, because, in fact, the 1982 Agreement recognized two different royalty rates depending on whether a patent was in existence or not. Further, Plaintiff agreed in the 1988 Letter Agreement to modify the two rate arrangement to Debiopharm's advantage by lowering the rate for all sales to 3%-the rate applicable where no patent was in existence. Plaintiff, however, fails to point out in its discussion of *Aronson*, that the Supreme

Court's analysis turned on the fact that "no patent ever issued." 440 U.S. at 263, 99 S.Ct. at 1100. Thus, while offering guidance in cases where no patent issued and the parties dispute the validity of a royalty agreement, *Aronson* adds little, if anything, to a dispute over the duration of royalties where a patent does issue. In the instant case, unlike in *Aronson,* the defendants do not dispute the validity of the parties' agreement for royalties on sales in countries where no patent issued.[5] Thus, Plaintiff's reliance on *Aronson* is misplaced.

Additionally, the Court recognizes that there is apparently no case in which a court has refused to apply the *Brulotte* holding to foreign patent license agreements. In fact, to the contrary, several courts have assumed *Brulotte's* rule applied. *See, e.g., Forbo–Giubiasco, S.A. v. Congoleum Corp.,* 78 Civ. 5390, 1985 WL 1827, 1985 U.S. Dist. LEXIS 18504 (S.D.N.Y. June 26, 1985) (finding that while royalty agreement was valid as to goods manufactured before patent expiration, no royalties were due for goods manufactured after the Swiss patents had expired, citing *Brulotte* ); *Compton v. Metal Products, Inc.,* 453 F.2d 38 (4th Cir.1971), *cert. denied,* 406 U.S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972) (applying the U.S. doctrine of patent misuse discussed in *Brulotte* to a U.S. agreement providing for royalties under foreign patents).

Finally, even ignoring the fact that the parties included a choice-of-law provision specifying that the laws of the United States would govern "each party's rights, duties, and obligation,"[6] (Rec. Doc. 83, Exh. 1, at 9, § 9) the Court agrees with Defendants that the application of United States law, and hence, *Brulotte,* is inevitable given the fact that the agreements in dispute were negotiated and entered into in the United States, that the patents are held by United States persons on a system discovered in the United States, that the contracting parties reside in the United States, and that the only viable alternative appears to be that the Court would have to examine the law of as many as eleven different countries in order to determine if those countries follow the same rule set out in *Brulotte.* The Court finds that such a result would be impractical and is not warranted by the circumstances of this case or the applicable law.

Accordingly, the Court concludes that Defendants' Motion for Partial Summary Judgment should be, and is hereby, GRANTED. Not only does the 1982 Agreement clearly and unambiguously state that royalties are due only during the existence of a patent in those countries where a patent issued, but the Supreme Court has held that no post-expiration patent royalties are recoverable under a license agreement. Plaintiff in the instant case is, therefore, prohibited from recovering any post-expiration royalties.

For all these same reasons, Plaintiff's Motion for Partial Summary Judgment on Defendants' Fourteenth Affirmative Defense and the issue of post-expiration royalties is DENIED.

## II. Plaintiff's Motion for Partial Summary Judgment on the 1988 Letter Agreement

■■■ Plaintiff also moves the Court for an order granting summary judgment on

---

**5.** While Defendants do not dispute that the agreements validly provide for a ten-year royalty period in countries where no patent issued, the parties do argue as to when that period began to accrue in certain countries.

**6.** Without ruling on the issue, the Court notes that there may be some ambiguity in the language of the choice-of-law clause as the parties have offered varying interpretations of the scope of the provision.

the construction of the 1988 Letter Agreement between the parties

Section 2 of the 1988 Letter Agreement provides:

Debiopharm is developing or causing to be developed for its use a new time-released microencapsulated delivery system for the Product. Debiopharm agrees to pay to Tulane a royalty of three percent (3%) of Net Sales of the Product or any Combination Product, or any improvement or modification thereto, in Debiopharm's time-released microencapsulated delivery system for a period of ten years from the date of the first commercial sale of the Product in each country, on a country by country basis, in Debiopharm's time-released microencapsulated delivery system, in the manner provided in the License Agreement.

Plaintiff urges that the terms of the 1988 Letter Agreement with respect to Debiopharm's obligation to pay royalties on sales of Decapeptyl Pamoate are not ambiguous and can be interpreted as a matter of law as requiring Debiopharm to pay a 3% rate on net sales of Decapeptyl Pamoate for ten years from the date of the first commercial sale of that product in each country where the product is sold, without regard to the existence or expiration of any Tulane patent. In addition, Plaintiff argues that the language, "in the manner provided in the License Agreement," relates to the currency and method of royalty payments, not the duration of those payments.

Debiopharm, on the other hand, argues that the phrase "in the manner provided in the License Agreement," qualifies the entire royalty payment provision. Defendants point out that Section 5 of the Letter Agreement references the original 1982 License Agreement and provides that "[i]n all other respects the License Agreement

is in full force and effect and performable by the parties in accordance with its terms." Therefore, Defendants argue that the duration of royalties on the new product is either for a period equivalent to the duration of the patent or for ten years, as provided in the 1982 Agreement.

In light of the letter's language and the parties' varying interpretations of that language, the Court finds that the 1988 Letter is ambiguous. It is not clear on the face of the Letter what is meant by the phrase, "in the manner provided in the License Agreement." Furthermore, the parties have presented contrary interpretations of the 1988 Letter Agreement, both of which are reasonable based solely on the language of the Letter. The fact that the parties have found it necessary to submit extrinsic evidence to corroborate their interpretations also supports the Court's conclusion that the meaning of the 1988 Letter Agreement cannot be determined as a matter of law.

There is clearly a genuine issue of material fact as to whether the parties intended to incorporate wholly the royalty payment provisions in the original license agreement, or whether they intended to establish an separate duration period for royalty payments on sales of the new pamoate-based product. Accordingly, the Court DENIES Plaintiff's Motion for Partial Summary Judgment on the issue of the 1988 Letter Agreement.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment (Rec.Doc. 79) is **GRANTED,** and Plaintiff's claims for any post-expiration patent royalties are dismissed. Plaintiff's Motion for Partial Summary Judgment (Rec.Doc. 74) is **DENIED,** because no post-expiration patent royalties are recoverable and there are genuine is-

sues of material fact as to the meaning of the 1988 Letter Agreement.