Stephen KIMBLE, an individual, and
Robert Grabb, an individual,
Plaintiffs,

v.

MARVEL ENTERPRISES,
INC., Defendant.

No. CV 08–372–TUC–DCB.

United States District Court,
D. Arizona.

March 2, 2010.

Antonio Raffaele Durando, Robert Michael Grabb, Stephen E. Kimble, Kimble & Grabb, PLLC, Tucson, AZ, for Plaintiffs.

David Fleischer, Jason T. Christiansen, Paul, Hastings, Janofsky & Walker, LLP, New York, NY, Sarah Katharyn Jezairian, Andrew Martin Jacobs, Joseph Anthony Kroeger, Snell & Wilmer, LLP, Tucson, AZ, for Defendant.

## ORDER

DAVID C. BURY, District Judge.

On December 2, 2009, Magistrate Judge Ferraro issued a Report and Recommendation (R & R). (Doc. 77.) He recommends granting Defendant's motion on termination of royalties when the patent expires and Plaintiffs' motion on the definition of "net product sales." He recommends denying Plaintiffs' four other motions. After an independent review of the record, the Court adopts the R & R as the opinion of the Court and grants and denies the motions for summary judgment accordingly.

## STANDARD OF REVIEW

The duties of the district court in connection with a R & R by a Magistrate Judge are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed. R.Civ.P. 72(b), 28 U.S.C. § 636(b)(1). Where the parties object to a R & R, "[a] judge of the [district] court shall make a *de novo* determination of those portions of the [R & R] to which objection is made." 28 U.S.C. § 636(b)(1); *see Thomas v. Arn,* 474 U.S. 140, 149–50, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). When no objection is

filed, the district court need not review the R & R *de novo.*

This Court's ruling is a *de novo* determination as to those portions of the R & R to which there are objections. 28 U.S.C. § 636(b)(1)(C); *Wang v. Masaitis,* 416 F.3d 992, 1000 n. 13 (9th Cir.2005); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121–22 (9th Cir.2003) (*en banc*). To the extent that no objection has been made, arguments to the contrary have been waived. *See* 28 U.S.C. § 636(b)(1)(A) (objections are waived if they are not filed within ten days of service of the R & R), *McCall v. Andrus,* 628 F.2d 1185, 1187 (9th Cir.1980) (failure to object to Magistrate's report waives right to do so on appeal); Advisory Committee Notes to Fed.R.Civ.P. 72 (citing *Campbell v. United States Dist. Court for N.D. Calif.,* 501 F.2d 196, 206 (9th Cir.1974) (when no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation)). Accordingly, the Court reviews only the objections raised in the briefs filed in objection to the R & R and reviews *de novo* the arguments urged before the Magistrate Judge that pertain to such objections. All other objections are waived.

## STATEMENT OF THE CASE

In 1997, Plaintiff Kimble [1] sued Toy Biz (now known as Marvel) for patent infringement and breach of contract based on an oral agreement in CV 97–557 TUC RCC. Kimble invented a web shooting toy, patent no. 5,072,856, which expires no later than May 25, 2010. In 1990, he met with Toy Biz to discuss his patent application and related ideas. Toy Biz agreed it would not use the ideas disclosed by Kimble without first negotiating a reasonable

[1] Plaintiff Grabb was not a party to the 1997 action. He acted as Kimble's attorney during that proceeding and is a signatory on the Agreement and a Plaintiff in this action.

royalty payment for their use. Toy Biz subsequently made and sold a toy, "Web Blaster" and refused to pay Kimble any royalty. Kimble sued Toy Biz. The District Court ruled as a matter of law that the Web Blaster did not infringe the Kimble patent, but there were disputed questions of fact as to the verbal agreement between the parties. After a jury trial, the court entered judgment for Kimble finding the Web Blaster was covered by the verbal agreement and awarded damages "to be 3.5% of net product sales, past, present and future excluding refill royalties." Both parties appealed. (R & R at 1165.)

While the appeal was pending, the parties entered into a settlement agreement (the Agreement). They withdrew their appeals and agreed to vacate the Judgment. The "key provision" of the Agreement, is as follows:

> 3. Marvel agrees to purchase from the Patent Holders and the Patent Holders agree to sell to Marvel the Patent which will be evidenced by an instrument of assignment in the form of exhibit C hereto. The purchase price for the Patent shall be payable to the Patent Holders as follows:
>
>> a. $516,214.62 upon execution and delivery of this Agreement; and
>>
>> b. 3% of "net product sales" (as such term is used in the Judgment) excluding refill royalties made after December 31, 2000. For purposes of this paragraph 3.b, "net product sales" shall be deemed to include product sales that would infringe the Patent but for the purchase and sale thereof pursuant to this Agreement as well as sales of the Web Blaster product that was the subject of the Action and to which the Judgment refers.

*Id.* at 1165–66 (citing doc. 47: Agreement at 4). The Agreement contains no expiration date.

On January 6, 2006, Marvel entered a licensing agreement with an independent company, Hasbro, effective in 2007, giving Hasbro copyright and trademark rights for Marvel characters in certain toy categories, and Hasbro began making versions of the Web Blaster. *Id.* at 1166.

Hasbro refused to sign a sublicense to pay Plaintiffs royalties owed under the Agreement. Since 2007, Hasbro has reported quarterly to Marvel the units sold, and Marvel receives royalties from Hasbro amounting to 10% of net sales of the licensed products. Up until May 2008, Marvel paid Plaintiffs 3% of Hasbro's net sales of various Web Blaster products. On May 23, 2008, Marvel informed Plaintiffs they were not entitled to royalties on Extra Value Items and that it had recalculated the 2007 royalties and determined Marvel had overpaid Plaintiffs by $282,700.00 *Id.* at 1166.

Plaintiff filed for breach of contract in state court. The action was removed to federal court by Defendant, who answered and counterclaimed for overpayment and declaratory judgment as to its obligations under the Agreement.

The matters have been fully briefed. Plaintiffs filed a Motion for Summary Judgment requesting the Court deny Marvel's counterclaim for the overpayment. (Ps' MSJ) (doc. 47). Plaintiffs/Counterdefendants filed a Motion for Partial Summary Judgment on Marvel's counterclaim of overpayment as to royalties owed on "3% of net product sales" for multi-functional toys, which are those that shoot not only the foam web but shoot additional things like darts, missiles, water, etc. (Ps' MPSJ) (doc. 48). Plaintiffs/Counterdefendants filed a Motion for Summary Judgment seeking declaratory judgment that Marvel continues to be responsible for certain obligations beyond the expiration of the patent, May 25, 2010. (Ps' MSJ) (doc.

49). Plaintiffs/Counterdefendants filed a Motion for Summary Judgment on Marvel's counterclaim of overpayment as to royalties owed on "3% of net product sales" for "extra value items" of the Web Blaster. (Ps' MSJ) (doc. 50). Plaintiffs filed a Motion for Partial Summary Judgment regarding the definition of "net product sales." (Ps' MPSJ) (doc. 51). Defendant, Marvel, filed a Motion for Summary Judgment for a declaratory judgment that any obligation to make payments pursuant to the Agreement terminates on the date the Kimble patent underlying the Agreement expires, May 25, 2010.(MSJ) (doc. 54).

The Magistrate Judge addressed the issues raised in these interrelated summary judgment motions in one R & R, as follows: Section B: whether, as a matter of law, Marvel owes royalties under the Agreement after the patent expires; Section C: whether, as a matter of law, "net product sales" is defined in the Agreement; Section D: whether, as a matter of law, Marvel owes royalties under the Agreement for Hasbro's net product sales, and Section E: whether, as a matter of law, Marvel owes royalties for improved Web Blasters and Extra Value Items.

The Magistrate Judge found that as a matter of law, Marvel is not required to pay royalties under the Agreement after the May 25, 2010, expiration of the Kimble patent. He found there was no genuine issue of material fact regarding the definition of "net product sales" in the Agreement—it means 93% of gross product sales. He found there are genuine issues of material fact in dispute which preclude summary judgment on the issue of sales by Hasbro for improved Web Blasters and Extra Value Items.

On December 16, 2009, the parties filed Objections to the R & R on the question of law: whether Marvel owes royalties after the expiration of the patent under the terms of the Agreement; whether Marvel owes royalties under the Agreement for Hasbro's "net product sales," and whether "net product sales" is defined as 93% of gross product sales.

## PLAINTIFFS/COUNTERDEFENDANTS' OBJECTIONS

Plaintiffs object to Magistrate Judge Ferraro's finding that the royalty Agreement ends when the patent expires. Plaintiffs argue that the Agreement transferred both patented and non-patented rights and while the royalties for the patented rights end with the patent, they do not end for non-patented rights which cover the Web Blaster.

This Court notes that Plaintiffs' position on whether the Web Blaster infringes on the Kimble patent has changed since the 1997 law suit and settlement. On appeal, Kimble argued that the Web Blaster infringed the patent. Kimble had prevailed on his breach of contract claims related to Defendant's oral agreement to not use the ideas he disclosed without negotiating a reasonable royalty payment, but he lost on summary judgment his patent infringement claim. Defendant appealed the Judgement for Kimble on the breach of contract claim.

The Agreement vacated the Judgment, which had issued in favor of Kimble on the breach of contract claim. The parties agreed for Marvel to purchase the patent at the purchase price of: "$516,214.62 and 3% of "net product sales" (as such term is used in the Judgment) ... For purposes of this paragraph 3.b, "net product sales" shall be deemed to include product sales that would infringe the Patent but for the purchase and sale thereof pursuant to this Agreement as well as sales of the Web Blaster product that was the subject of the Action and to which the Judgment refers." "Net product sales," as such term was

used in the Judgment referred to the Web Blaster that had been found to *not* infringe on the Kimble patent. The 3% net product sales was deemed to "include product sales that would infringe the Patent *as well as sales of the Web Blaster product that was the subject of the Action and to which the Judgment refers.*" This language in the Agreement is arguably in keeping with the parties' interpretations of the Agreement "as transferring the patent right and the rights to the toy idea(s) verbally exchanged between Kimble and Toy Biz in 1990." (R & R at 1168.)

"Because the parties are in agreement, and the outcome is the same whether the Agreement transferred only patent rights or both patent and non-patent rights, the [Magistrate Judge] also assessed the latter possibility." *Id.* The Magistrate Judge correctly found that the Agreement is a hybrid under the law. Plaintiffs' argument that the Agreement creates separable rights, "patent rights" and "non-patent rights" fails because there is no distinction between the royalties for these two. (R & R at 1168–69) (discussing hybrid concept from *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1371–72 (11th Cir.1983); *Boggild v. Kenner Products,* 776 F.2d 1315, 1319 (6th Cir.1985)).

Plaintiffs' argument also fails under the seminal case on the issue, *Brulotte v. Thys Co.,* 379 U.S. 29, 32, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), in which the Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*" *Id.* at 1167. In *Brulotte,* the Court distinguished the situation from ones in which non-patented items are priced based on long-term use or in which different arrangements would apply before and after the expiration of a patent. *Id.* (citing *Brulotte,* 379 U.S. at 31–32, 85 S.Ct. 176). "The Court emphasized that because the terms were the same both before and after

expiration of the patent, they were 'unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage.'" *Id., see also Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 259–262, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979) (distinguishing a situation with two agreements, one for a 5% royalty for the item in the inventor's pending patent application and the second for a 2½% royalty if the patent application was not allowed within five years, because the 2½% royalty did not rely on a patent). As noted by the Magistrate Judge the reduced royalty in *Aronson* was negotiated for the express purpose of compensation in the absence of a patent. The *Aronson* agreement did not offend the principle emphasized in *Brulotte* that it is unlawful to leverage a patent monopoly beyond its expiration.

This Court has read *Zila, Inc. v. Tinnell,* 502 F.3d 1014 (9th Cir.2007) and agrees with the Magistrate Judge that even though Plaintiffs rely on this case, it does not support them. *Id.* at 1167. In *Zila,* the Ninth Circuit considered an Agreement containing a royalty provision for "a five percent (5%) royalty on gross sales of [Zila] of the invention" in perpetuity. *Zila,* 502 F.3d at 1017. It was uncontested that when the parties entered into the Agreement they did not know whether any patent would issue on the invention, and they did not intend the royalties to relate in any way to patents that might or might not be obtained. *Id.* Subsequently, however, patents were obtained. After criticizing *Brulotte* and its progeny, the Ninth Circuit held that for the sake of national uniformity in patent law it would follow the majority view that under *Brulotte* state contract law is preempted "on facts that (1) a patent did *not* issue in [a]

case and (2) the underlying agreement provided for a lower royalty if no patent issued than if one did." *Id.* at 1022. The court held that since a patent did issue for the *Zila* invention, *Brulotte* controlled and the royalty provision was unenforceable after the last of the patents covering the invention ended. In *Zila,* the court applied *Brulotte* to a royalty provision covering "the invention," covering both patent and non-patent rights.

Following *Zila,* the Magistrate Judge correctly applied *Brulotte* in this case to find that the royalty provision is unenforceable after the expiration of the Kimble patent.

## DEFENDANT'S OBJECTIONS

Defendant raises two objections: 1) whether Marvel owes royalties for Hasbro's "net product sales" and 2) whether "net product sales" is defined as 93% of gross product sales. (D's Objection at 1.)

First, Defendant objects to what Plaintiffs correctly point out is dicta in the Magistrate Judge's R & R: " 'Marvel owes Plaintiffs a 3% royalty for anyone's product sales covered by the Agreement.' " (D's Objection at 2 (quoting R & R at 1172)). Specifically, Defendant objects to the following:

> Contrary to Marvel's contention, this would not obligate [Marvel] to pay for sales by an unrelated third-party. A third-party with no relationship to Marvel could not legally manufacture a toy within either of these categories [in paragraph 3.b of the Agreement] because Marvel owns the patent and it owns the right to Spider–Man, and the Web Blaster is a Spider–Man toy. Thus, Marvel has complete control over the sale of any toys within those two categories.

*Id.* (citing R & R at 1171). "Marvel object to the above findings because they misapprehend the facts and overstate Marvel's rights as an intellectual property holder." (D's Objection at 2.)

The issue before the Court has nothing to do with an unrelated third-party. As Defendant recognizes, the "plaintiffs themselves have conceded that the Agreement would not require Marvel to pay royalties on such sales." *Id.* at 3. "Plaintiffs admitted that if a third-party such as Mattel were to independently come out with a toy that infringed the Kimble patent, Marvel would not be obligated to pay Kimble a royalty on Mattel's sales of that product." *Id.* Defendant then argues that because Marvel would not be obligated to pay royalties for a third-party's sales of products covered by the Agreement if the company had no relationship with Marvel, the fact of the licensing relationship between Marvel and Hasbro should not change the result, "given that the [A]greement between Hasbro does not license any of the rights covered by the Agreement." (Objection at 3.)

Whether or not the licensing agreement between Hasbro and Marvel licensed any rights covered by the Marvel–Kimble Agreement is a disputed question of fact to be resolved at trial, and as thoroughly discussed in the R & R the relationship between Hasbro and Marvel does make a difference. "Under the licensing agreement, Marvel receives 10% of Hasbro's net sales for the use of the Spider–Man license and trademark." (R & R at 1171.) "Hasbro, which is making the Web Blaster, is making it as Marvel's assignee and paying Marvel for the rights to do so." (Ps' Reply to D's Objection at 3.) In other words, the 3% royalty provision in the Agreement applies, if a jury finds that Hasbro is manufacturing and selling any product under its licensing agreement with Marvel, covered by the Marvel–Kimble Agreement.

Second, "Marvel objects to the ruling in section III.C of the report and recommen-

dation for the reasons stated in defendant's opposition to plaintiffs' motions for summary judgment section IV.C.4. (dkts. 59 at p. 23–24 and 60.)" (D's Objection at 5.) "In response, Plaintiffs incorporate those relevant portions of their Motion for Summary Judgment." (Ps' Reply at 3.)

Defendant fails to raise a proper objection to the R & R to invoke this Court's *de novo* determination of this portion of the R & R. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 149–50, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (explaining when no objections are filed, the district court need not review the R & R *de novo* ). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues-factual and legal-that are at the heart of the parties' dispute." *Thomas*, 474 U.S. at 147, 106 S.Ct. 466. Precluding review of any issue not contained in an objection, prevents a litigant from "sandbagging" the district judge by failing to object and then appealing. "Absent such a rule, any issue before the magistrate would be a proper subject for appellate review." Without the rule requiring parties to object, the district court would have to review every issue in every case, no matter how thorough the magistrate's analysis. The rule promotes the efficient use of judicial resources. *Id.* These principles require a party to do more than simply object, without identifying and explaining the objection. Defendant has done nothing more than the legal equivalent of filing a notice of some nondescript objection.

Nevertheless, the Court has reviewed *de novo* Subsection III.C of the R & R, wherein the Magistrate Judge found that as a matter of law in the Agreement the definition of "net product sales" means 93% of gross product sales. (R & R at 1169–70.) The Court agrees with the Magistrate Judge's conclusion that the Agreement is ambiguous because "net

product sales" is not defined, but only refers to the term as used in the Judgment, and the term was not defined in the Judgement.· *Id.*

The Magistrate Judge relied on extrinsic evidence of deposition testimony from the 1997 action and the parties' performance under the Agreement through 2006, during the time it was selling toys. The Magistrate Judge found that the Defendant's arguments were conclusory, and Defendant failed to provide any conflicting evidence or any other definition the parties may have intended at the time they adopted the Agreement. The Defendant's unsupported contentions remain unsupported, and as recommended by the Magistrate Judge, this Court finds that the term "net product sales" means 93% of gross product sales.

## CONCLUSION

As a matter of law, Defendant is not required to pay royalties under the Agreement after the May 25, 2010 expiration of the patent. As a matter of law, the term "net product sales" in the Agreement means 93% of gross product sales. There are genuine issues of material fact precluding summary judgment on all other issues.

After *de novo* review of the issues raised in the parties' Objections, this Court agrees with the findings of fact and conclusions of law made by the Magistrate Judge in his Report and Recommendation for determining the pending motions.

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation is adopted as the Opinion of the Court.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment (doc. 49) is DENIED; the Defendant's Motion for Summary Judgment (doc. 54) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (doc. 51) is GRANTED.

**IT IS FURTHER ORDERED** that all other summary judgment motions (doc. 47, 48, 49) are DENIED.

**IT IS FURTHER ORDERED** WITHDRAWING THE REFERENCE from Magistrate Judge Ferraro. This matter shall be tried by the Honorable David C. Bury.

**IT IS FURTHER ORDERED** that the parties shall file a Joint Pretrial Order by March 26, 2010. (*See* attached form of Order.) Subsequently, the Court shall set a pretrial conference and the trial date will be set at the pretrial conference.

## PRETRIAL ORDER

(Although the text of the pretrial order appears in single space, the actual order submitted by the parties must be double spaced and conform in all other respects to the Local Rules.)

The following are pretrial proceedings in this cause pursuant to Rule 16.2 of this Court, and **IT IS ORDERED:**

### I.  *NATURE OF ACTION*

This is an action for: (Short concise statement of the case, including the nature of the action and the relief sought.)

### II.  *STATEMENT OF JURISDICTION*

Statement of jurisdiction: (state the claims and cite the statutes which give this Court jurisdiction over each claim.)

### III.  *CONTESTED ISSUES OF LAW/ FACT*

State the ultimate issues of fact and law which must be decided at trial. State only the issues of fact and law necessary and material for a verdict in this case. Each issue must be stated separately and specifically.

### IV.  *LIST OF EXHIBITS*

Each party shall list the exhibits it intends to offer at trial.

### V.  *LIST OF WITNESSES*

Each party shall list the witnesses it intends to call at trial.

### VI.  *JURY TRIAL or BENCH TRIAL*

The parties shall state whether the trial is a jury or bench trial.

*For a Jury Trial*

At the Pretrial Conference, the Court will direct the parties to file proposed voir dire, objections to exhibits, deposition testimony, stipulated jury instructions, counsel's additional proposed jury instructions, motions in limine, and trial memoranda 20 days prior to trial. Any opposition shall be filed five days thereafter.

*For a Bench Trial*

At the Pretrial Conference, the Court will direct the parties to file trial briefs, objections to exhibits, motions in limine, and proposed findings of fact and conclusions of law 20 days prior to trial. Any opposition shall be filed five days thereafter.

### VII.  *PROBABLE LENGTH OF TRIAL*

Each party shall identify the estimated length of time it will take to present its case.

### VIII.  *CERTIFICATION*

The undersigned counsel for each of the parties in this action do hereby approve and certify the form and content of this proposed Joint Pretrial Order.

_____

Attorney for Plaintiff

_____

Attorney for Defendant

This Joint Pretrial Order is hereby approved on this ———— day of ————————, 2006.

## REPORT AND RECOMMENDATION

D. THOMAS FERRARO, United States Magistrate Judge.

Pending before the Court are Plaintiffs' five Motions for Summary Judgment and Defendant's Motion for Summary Judgment. (Dkts. 47–51, 54.) Both parties have filed responses and replies. (Dkts. 59, 63, 64, 67.) Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Ferraro for a report and recommendation. The Magistrate Judge recommends the District Court, after its independent review of the record, enter an order granting Defendant's motion on termination of royalties when the patent expires, granting Plaintiffs' motion on the definition of "net product sales," and denying Plaintiffs' four other motions.

## I

## PROCEDURAL BACKGROUND

In 1997, Plaintiff Kimble filed suit against Toy Biz (the predecessor of Marvel) in this Court, *Kimble v. Toy Biz, et al.*, No. CV97–557–TUC–RCC (the 1997 Action), alleging patent infringement and breach of contract based on an alleged oral agreement. The patent claim was resolved on a motion for summary judgment in favor of Marvel. Thereafter, Kimble obtained a judgment against Toy Biz on the contract claim. Both parties appealed. In 2001, while the appeals were pending, the parties entered a settlement agreement (Agreement). In 2008, Plaintiffs filed this action, alleging breach of the Agreement.[1] (Dkt. 1, 23.) Defendant counterclaimed seeking a declaratory judgment and alleging unjust enrichment. (Dkt. 33.) After completing discovery, the parties filed the instant motions. On November 6, 2009, the Court heard oral argument on the motions.

## II

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must produce evidence and persuade the court there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000). A material fact is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Id.* at 250, 106 S.Ct. 2505. When the moving party has carried its burden under Rule 56(c), the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the court presumes the nonmoving party's evidence is true and draws all inferences from the evidence in the light most favorable to the nonmoving party. *Eisen-*

---

1. Plaintiffs' complaint also alleged bad faith, fraud, and unjust enrichment. The parties stipulated to dismissal of those counts. (Dkt. 29.)

*berg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987). Each numbered paragraph of the moving party's separate statement of facts shall be deemed admitted for purposes of the motion for summary judgment if not specifically controverted by a correspondingly numbered paragraph in the opposing party's separate statement of facts. LRCiv 56.1(b).

# III

# DISCUSSION

Plaintiffs moved for summary judgment on Defendant's Counterclaims 1(a), 2, 3, 4, and the definition of "net product sales" in the Agreement. Defendant moves for summary judgment on its Counterclaim 1(a).

## A. *Relevant Undisputed Facts* [2]

Kimble is the inventor of a web shooting toy described in U.S. Patent No. 5,072,856. (Dkt. 49-3.) The Kimble patent expires no later than May 25, 2010. (Dkt. 33, ¶ 31; Dkt. 44, ¶ 1.) The 1997 Action, *Kimble v. Toy Biz, et al.,* No. CV97-557-TUC-RCC, alleged patent infringement and breach of an oral contract. (Dkt. 49-4.) Kimble alleged that in 1990 he met with Toy Biz president Lou Schwartz to discuss Kimble's patent application and related ideas. At that meeting, Schwartz agreed that Toy Biz would not use the ideas disclosed by Kimble without first negotiating a reasonable royalty payment for their use. (*Id.,* ¶¶ 26, 27.)

Kimble also alleged in the 1997 Action that Toy Biz subsequently made and sold a "Web Blaster" toy based on Kimble's ideas, but refused to pay Kimble any royalty. (*Id.,* ¶ 30.) The Web Blaster is a role play toy whose primary play value is to allow the user to adopt aspects of Marvel's Spider–Man character by shooting foam string. (Dkt. 56-2 at 4.) The District Court ruled as a matter of law that the Web Blaster did not infringe the Kimble patent, but that the claims concerning the verbal agreement involved disputed issues of fact for a jury to decide. (Dkt. 49-5.)

After a jury trial on the breach of contract claim, the District Court entered judgment in favor of Kimble and against Toy Biz, finding that the Web Blaster was covered by the verbal agreement and awarding "the full damages to be 3.5% of net product sales, past, present and future excluding refill royalties." (Dkt. 49-6.) Both parties appealed the judgment.

While appeal was pending, on September 21, 2001, Plaintiffs Kimble and Grabb (the "Patent Holders")[3] entered the Agreement with Defendant Marvel to end the pending litigation. (Dkt. 47-3.) Thereafter, the appeals were withdrawn and the judgment vacated. (*Id.* at 3.) The key provision of the Agreement relevant to the instant matter provides:

3. Marvel agrees to purchase from the Patent Holders and the Patent Holders agree to sell to Marvel the Patent which will be evidenced by an instrument of assignment in the form of exhibit C hereto. The purchase price for the Patent shall be payable to the Patent Holders as follows:

a. $516,214.62 upon execution and delivery of this Agreement; and

b. 3% of "net product sales" (as such term is used in the Judgment) excluding refill royalties made after December 31, 2000. For purposes of this paragraph 3.b, "net product sales"

2. The relevant undisputed facts were taken from the parties' statements of facts, responses, and replies thereto. (Dkts. 47-1, 48-1, 49-1, 50-1, 51-1, 55, 60, 63-1, 66, 67-1.)

3. Robert Grabb is not on the patent application nor was he a party to the 1997 Action, rather, he acted as Kimble's attorney during that proceeding. He is a signatory of the Agreement and a party to the instant case.

shall be deemed to include product sales that would infringe the Patent but for the purchase and sale thereof pursuant to this Agreement as well as sales of the Web Blaster product that was the subject of the Action and to which the Judgment refers.

(*Id.* at 4.) The Agreement contains no expiration date.

David Fremed, Toy Biz CFO, testified in the 1997 Action that "net sales" in the industry meant "gross sales of certain products less some reserve associated with deductions, discounts, returns, allowances." Marvel used a fixed 7% as that reserve, a "P & L allowance." (Dkt. 51–4 at 3–5; Dkt. 62–8 at 7; Dkt. 62–2 at 4.) During 2001–2006, Marvel paid 3% royalties on 93% of the invoiced sale of Web Blasters, taking 7% off as a "P & L allowance." (Dkt. 61, ¶ 4; Dkt. 51–4 at 5–6.)

On January 6, 2006, Marvel entered a licensing agreement with Hasbro. (Dkt. 73 (sealed).) The licensing agreement gave Hasbro copyright and trademark rights for Marvel characters in certain toy categories, including role-play toys. (Dkt. 50–6 at 3.) Hasbro began making versions of the Web Blaster pursuant to the licensing agreement in 2007. (*Id.* at 5.) While negotiating the Agreement, the parties never discussed what would happen if Marvel stopped making Web Blasters and entered into a licensing agreement. (Dkt. 62–1 at 9.)[4]

Between August 2006 and May 2007, Marvel negotiated with Hasbro to sign a Toy Technology Sublicense Agreement, which would have obligated Hasbro to pay Plaintiffs the royalties owed under the Agreement; Hasbro declined to sign the sublicense. (Dkt. 50–6 at 13–14; Dkts. 50–8, 50–9.) Since 2007, Hasbro has sold several versions of the Web Blaster, some of which are packaged in kits with "Extra Value Items." (Dkt. 62–10 at 6–15.) Hasbro also has been selling the Ultimate Web Blaster, which rotates through five shooting functions. (Dkt. 62–10 at 7–15; Dkt. 62–11.) Since 2007, Hasbro has reported quarterly to Marvel the units sold (Dkt. 62–8 at 6) and has paid Marvel royalties amounting to 10% of net sales of the licensed products (Dkt. 50–6 at 10–11).

Up until May 2008 (which included payments for all of 2007), after the resolution of some disputes, Marvel paid Plaintiffs 3% of Hasbro's net sales of various Web Blaster products. (Dkt. 67–35; Dkt. 50–4, ¶ 6; Dkt. 50–5, ¶ 6; Dkt. 60 at 10, ¶ 7; Dkt. 61, ¶ 8.) These royalties included payments for Web Blaster kits with Extra Value items. (Dkt. 50–4, ¶ 6; Dkt. 50–5, ¶ 6; Dkt. 50–2 at 2, ¶ 7; Dkt. 60 at 10, ¶ 7; Dkt. 61, ¶ 7.) Plaintiffs exercised their right to audit Marvel's financial records with respect to the 2007 net product sales. (Dkt. 23, ¶ 12; Dkt. 33, ¶ 12.) On May 23, 2008, Marvel informed Plaintiffs they were not entitled to royalties on Extra Value Items and Marvel had recalculated 2007 royalties and determined Marvel had overpaid Plaintiffs by $282,700. (Dkt. 62–4.)

**B.** ***Whether, as a Matter of Law, Marvel Owes Royalties Under the Agreement After the Patent Expires***

Both Plaintiffs and the Defendant seek summary judgment on the issue of whether royalty payments extend beyond the patent's expiration, May 25, 2010 (Counterclaim 1(a)). Plaintiffs contend royalties are due under the Agreement for as long as Marvel receives revenue for Web Blaster sales. Defendant argues the royalty provision in the Agreement is unenforceable after the patent expires. The opposing motions demonstrate that both

---

**4.** Marvel has not manufactured or directly marketed any Web Blasters since prior to 2007. (Dkt. 60 at 20, ¶ 21; Dkt. 67–1 at 17, ¶ 21.)

parties agree there is no issue of material fact and summary judgment is appropriate. The Court agrees that this is purely a legal question.

The seminal case on this issue is *Brulotte v. Thys Co.*, 379 U.S. 29, 32, 85 S.Ct. 176, 13 L.Ed.2d 99 (1965), which held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." In *Brulotte*, a patent-owner sold a hop-picking machine for a flat fee and issued a license, which made payable an annual royalty and also precluded assignment of the license or removal of the machine from the county. 379 U.S. at 29, 85 S.Ct. 176. The Court found the licensing agreement unenforceable after expiration of the patent because to conclude otherwise would allow assertion of the monopoly power of the patent beyond its term. *Id.* at 33, 85 S.Ct. 176. The Court distinguished the situation from ones in which non-patented items are priced based on long-term use or in which different arrangements would apply before and after the expiration of a patent. *Id.* at 31–32, 85 S.Ct. 176. The Court emphasized that because the terms were the same both before and after expiration of the patent, they were "unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage." *Id.* at 32, 85 S.Ct. 176.

The Court subsequently distinguished a situation in which an inventor and a manufacturer entered two agreements, one for a 5% royalty for the item in the inventor's pending patent application, and the second for a 2½% royalty if the patent application was not allowed within five years. *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 259, 99 S.Ct. 1096, 59 L.Ed.2d 296

(1979). The Court distinguished *Brulotte* because the contract for a 2½% royalty did not rely on a patent. *Id.* at 262, 99 S.Ct. 1096 (finding that federal law did not preempt state contract law in this situation). The reduced royalty was negotiated for the express purpose of compensation in the absence of a patent. Hence, the *Aronson* agreement did not offend the principle emphasized in *Brulotte*—it is unlawful to leverage a patent monopoly beyond its expiration. *Id.* at 265, 99 S.Ct. 1096. The Court noted that "[n]o doubt a pending patent application gives the applicant some additional bargaining power for purposes of negotiating a royalty agreement," which cannot extend beyond a patent term; however, because the lower royalty rate was negotiated for the express contingency of no patent, it was enforceable. *Id.*

Plaintiffs rely on *Zila, Inc. v. Tinnell*, 502 F.3d 1014 (9th Cir.2007), to support their argument that this Court should give effect to the parties' intent that the royalty continue as long as the toys are sold. *Zila* is the leading Ninth Circuit case on this issue and it involved a contract intended by the parties to, and drafted to, grant a 5% royalty in perpetuity on sales of a herpes treatment in exchange for all rights to the treatment, including any future patents (four of which were eventually obtained). 502 F.3d at 1016. Contrary to Plaintiffs' argument, the Ninth Circuit was unable to enforce the parties' intent because it found that "*Brulotte* preempts state law with regard to a contract for payment of royalties on the sale of an invention that may be patented, if a patent indeed issues." *Id.* at 1020, 1022. Thus, *Zila* illustrates that *Brulotte* may override the parties' intent regarding the length of a royalty provision.

Here, the parties are in accord that the Agreement provided for the sale of a patent right.[5] Whether the Agreement also

---

**5.** Plaintiffs' attorney reaffirmed the Agreement provided for the sale of Plaintiff's patent

transferred non-patent rights is less clear. The plain language of paragraph three of the Agreement provides that the only right Plaintiffs transferred to Marvel was the patent. "The purchase price for the Patent shall be" royalty payments for two categories of toys (infringing and the Web Blaster previously litigated). (Dkt. 47–3, ¶ 3.) Although royalties are due for sales of the Web Blaster, there is no release or transfer relating to the Web Blaster. In fact, paragraph 9 of the Agreement provides: "Except for the obligations undertaken by Marvel in this Agreement and except for those obligations under the alleged verbal agreement that was the subject of the Action, the Patent Holders hereby release and discharge Marvel . . . ." (Dkt. 47–3, ¶ 9.) Plaintiffs contend this language demonstrates the Agreement provided obligations separable from the patent. Although Plaintiffs may have reserved non-patent rights, the Agreement does not clearly transfer any of these non-patent rights. Paragraph nine more reasonably suggests that Plaintiffs reserved the non-patent rights from the verbal agreement and did not transfer them to Marvel.

The plain language of the Agreement clearly relies on a patent and does not have separate provisions for non-patent rights, the distinction made by *Aronson*. Because the Agreement is premised on a patent, *Brulotte* controls and the royalty cannot extend beyond the life of the patent.

Despite the plain language of the Agreement, both parties interpret the Agreement as transferring the patent right *and* the rights to the toy idea(s) verbally exchanged between Kimble and Toy Biz in 1990. At oral argument, Defendant could not identify any language in the Agreement that transferred a non-patent right. Nevertheless, Defendant asserted the

transfer of non-patent rights was implicit in the Agreement. Because the parties are in agreement, and the outcome is the same whether the Agreement transferred only patent rights or both patent and non-patent rights, the Court will also assess the latter possibility.

Plaintiffs contend that, pursuant to the royalty provision of the Agreement there are separable rights, "patent rights" and "non-patent rights." Under their interpretation, in consideration for non-patent rights there is a 3% royalty on the non-infringing toys, which is distinct from the 3% royalty for infringing toys. They agree that no royalties would be due for infringing products after the expiration of the patent, but argue for the continuation of royalty payments for toys not tied to the patent. Defendant contends there is no distinction between royalties for patent rights and those for non-patent rights. Therefore, they conclude the Agreement is a hybrid under the law. To the extent the Agreement can be interpreted as transferring non-patent rights, the Court agrees with Defendant.

In *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1371–72 (11th Cir.1983), the circuit court emphasized that a "hybrid" agreement providing royalties for patent rights and trade secrets was no different than *Brulotte* which licensed both patent rights and "use." Because restrictions and royalties applied the same before and after the expiration of the patent, which indicates the projection of the patent monopoly beyond its period, the agreement was unenforceable beyond the patent expiration. *Id.* at 1373. The Sixth Circuit followed the Eleventh, holding, "enforcement of royalty provisions for other rights which conflict with and are indistinguishable from royalties for patent rights, is precluded." *Boggild v. Kenner Products,* 776

at oral argument.

F.2d 1315, 1319 (6th Cir.1985). Here, the Agreement does not distinguish royalties for the patent from those paid for non-patent rights, or royalties before and after the patent expires.

The inseparability of the rights transferred is illustrated by the history of the Agreement. When the Agreement was executed, Plaintiffs believed Marvel was infringing their patent and were pursuing an appeal to vindicate this belief. Thus, patent rights and infringement were still in dispute and the parties entered into the Agreement to settle all issues, patent and contract, in order "to avoid the further expense and distraction of litigation." (Dkt. 47–3 at 2, ¶ E.) To that end, the Agreement included a royalty for certain toys, infringing or not. Since the signing of the Agreement, the parties have continued to take various positions on whether any toys sold would have infringed the patent. (Dkt. 48–7 at 10–11; Dkt. 56–2 at 5–7; Dkt. 67–36 at 3–4; Dkt. 67–37 at 6.) The Agreement created no distinction, nor has one been made by the parties, for royalty payments for infringing versus non-infringing toys.

Although conceding the patent was part of the bargain at oral argument, Plaintiffs contended that their leverage in negotiating the Agreement was the judgment not the patent. As noted above, the issue of patent rights and infringement were actively in dispute and the Agreement was negotiated to settle those issues. The Sixth Circuit held in *Boggild* that when anticipated patents are used as leverage to negotiate a royalty agreement, regardless of the fact that the application has not been filed, *Brulotte* invalidates the agreement to the extent it extends beyond expiration of the eventually-issued patent. 776 F.2d at 1319. The Seventh Circuit has similarly held that a contract transferring an "invention" and the right to seek a patent for the invention, triggers *Brulotte*

once a patent issues because the patent possibility put the inventor in a stronger bargaining position. *Meehan v. PPG Indust., Inc.*, 802 F.2d 881, 885 (7th Cir. 1986). Here, because a patent was used as leverage to negotiate the Agreement, which transferred the patent rights, it fits squarely within the parameters of *Brulotte*. *See Aronson*, 440 U.S. at 265, 99 S.Ct. 1096.

Accordingly, the Court finds the Agreement is governed by *Brulotte* and the royalty provision is unenforceable after expiration of the patent. This is true if the Agreement is interpreted as transferring only a patent right, in which case the royalty provision is clearly premised on a patent, or if the Agreement is a hybrid and transfers patent and non-patent rights for royalties that are inseparable between the two rights.

### C. *Whether, as a Matter of Law, "Net Product Sales" is Defined*

■ Plaintiffs seek summary judgment on the definition of the term "net product sales" in the Agreement. Plaintiffs contend that "net product sales" means 93% of gross product sales.

■ The Agreement is governed by New York law. (Dkt. 47–3 at 7, ¶ 14.) When interpreting a contract, the goal is to give effect to the parties' intent. *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907, 909 (1973). "Whether an agreement is ambiguous is a question of law for the courts." *Kass v. Kass*, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 181 (1998). Here, the Agreement is ambiguous because "net product sales" is not defined. The Agreement only provides that the term is used as it "is used in the Judgment," (Dkt. 47–3, ¶ 3.b) but that term is not defined in the judgment. If a contract is ambiguous, courts may consider

extrinsic evidence to interpret it.[6] *Hartford Accident & Indem.*, 350 N.Y.S.2d 895, 305 N.E.2d at 909.

The available extrinsic evidence includes testimony in the 1997 Action defining "net product sales" and the parties' course of performance. The CFO for Toy Biz, David Fremed, testified in a deposition for the 1997 Action that in the industry "net sales" is "gross sales of certain products less some reserve associated with deductions, discounts, returns, allowances." (Dkt. 51–4 at 3–5.) Marvel used a fixed 7% for that reserve, referred to as a "P & L allowance." (*Id.*) Plaintiffs believed, at the time they entered the Agreement, that "net product sales" meant 93% of gross product sales. (Dkt. 51–5, ¶ 1; Dkt. 51–6, ¶ 1.) The same definition for net sales provided by Fremed was reiterated by other Marvel executives in depositions for this case. (Dkt. 62–8 at 7; Dkt. 62–2 at 4.)

■ From 2001 to 2006, Marvel paid Plaintiffs 3% royalties on 93% of the invoiced sales of Web Blasters, taking 7% off as a "P & L allowance." (Dkt. 61, ¶ 4; Dkt. 51–4 at 5–6.) "The parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'" *Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44, 691 N.Y.S.2d 508 (N.Y.App. Div.1999) (the parties' interpretation for "any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

Marvel argues that, with respect to a particular agreement, the term "net sales" to which Fremed testified might be a "completely different term" from "net product sales." While "net sales" and "net product sales" might not have the same meaning in varying contexts, Marvel's contention that they did not mean the same thing as to the Agreement between the parties is unsupported. Testimony by Marvel executives does not establish any distinction between net sales and net product sales, at least with respect to this Agreement. (Dkt. 62–2 at 4.) To the contrary, Marvel confirms that it paid royalties on 93% of invoiced sales through 2006 when it was selling toys. Marvel does not contend that these payments were erroneous or that was not the intended definition. Rather, it makes the conclusory argument that "this does not establish that 93% of the 'invoiced sales' is the definition of 'net product sales' as an undisputed fact." (Dkt. 59 at 28.) Defendant does not provide any conflicting evidence or any other definition the parties may have intended. An unsupported assertion is insufficient to create a "genuine issue for trial." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348.

Marvel further argues that 93% is no longer the appropriate number because, since 2007, Hasbro has been the decision-maker regarding the packaging and selling of the toys. Up until Hasbro began selling the Web Blaster there was no dispute that "net product sales" meant 93% of gross product sales. Marvel provides no expla-

**6.** Relying primarily on New York law, Defendant suggests that if the Court has to look to extrinsic evidence, disputed issues of fact are necessarily implicated and summary judgment is precluded. (Dkt. 59 at 19, 20.) First, although New York law governs the substantive contract issues before the Court, such as which facts are material, the ultimate question, whether there is a genuine dispute of fact, is assessed under federal standards. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (the court determines if there is a factual issue that a jury could reasonably resolve in favor of either party). Second, New York law does not require such a rule. *See Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44–45, 691 N.Y.S.2d 508 (N.Y.App.Div.1999) (when the moving party sets forth extrinsic evidence of the parties' intent and the responding party does not provide any conflicting evidence, summary judgment is properly granted).

nation or evidentiary support for how their licensing agreement with Hasbro, effective in 2007, alters what the parties intended the term "net product sales" to mean in their 2001 Agreement.[7]

In sum, Plaintiffs set forth undisputed facts regarding what the parties understood "net product sales" to mean at the time they entered the 2001 Agreement, and how it was used in royalty payments up through 2006. It was consistently interpreted to mean 93% of gross product sales. Marvel has not produced any conflicting evidence to alter that definition. Thus, summary judgment for Plaintiffs is appropriate.

### D. Whether, as a Matter of Law, Marvel Owes Royalties Under the Agreement For Hasbro's Net Product Sales

■ Counterclaim 2 alleges that Marvel mistakenly paid Plaintiffs for Hasbro's sales in 2007, unjustly enriching Plaintiffs, when the Agreement did not require payments for sales by Hasbro.[8] Plaintiffs seek summary judgment on their entitlement to royalties for Hasbro's sales of toys. As discussed in more detail below, the Court finds there are triable issues of fact regarding whether the toys manufactured by Hasbro are within the scope of the Agreement.

The plain language of the Agreement obligated Marvel to pay a 3% royalty to Plaintiffs for any products within the two

categories specified by the Agreement—products that would infringe the patent and the Web Blaster litigated in the prior Action. The Agreement has no limitations based on who is manufacturing and/or marketing the products. Contrary to Marvel's contention, this would not obligate it to pay for sales by an unrelated third-party. A third-party with no relationship to Marvel could not legally manufacture a toy within either of these categories because Marvel owns the patent and it owns the right to Spider–Man, and the Web Blaster is a Spider–Man toy. Thus, Marvel has complete control over the sale of any toys within those two categories.

Under the licensing agreement, Marvel receives 10% of Hasbro's net sales for the use of the Spider–Man license and trademark. (Dkt. 50–6 at 3, 10.) Marvel argues that continuing its 3% royalty obligation to Kimble would lead to an absurd result requiring Marvel to pay 30% of the royalties they received from Hasbro to Plaintiffs. If this is an absurd result, it was created by Marvel with full knowledge of its obligations under the Agreement.[9] Additionally, the 30% figure on which Marvel relies has little meaning in the abstract. There is no evidence in the record regarding Marvel's profit when it manufactured the Web Blaster, and the percentage of that paid to Plaintiffs, versus its profit as a licensor, and what percentage of that the 3% royalty constitutes.

---

**7.** Defendant points to Plaintiffs' assertion that, since 2007, Marvel has paid royalties on 87.2% of Hasbro's gross sales of Web Blasters, not on 93% (Dkt. 62–9 at 4). In addition to the fact that this unproven, it is not material to resolving the parties' intention as to the definition of "net product sales" in the 2001 Agreement.

**8.** In relation to this claim, Plaintiffs contends the Hasbro license amounts to an assignment of Marvel's rights under the Agreement; Defendant disagrees. Whether any rights were

legally assigned to Hasbro, the parties agree that no duties relative to the Agreement were assigned. (Dkt. 47 at 5; Dkt. 59 at 14; Dkt. 67 at 9.) Resolution of whether there was an assignment of rights to Hasbro is irrelevant because any duty remains with Marvel.

**9.** Marvel apparently attempted to avoid this result by obligating Hasbro to pay Plaintiffs the royalties owed under the Agreement through a Toy Technology Sublicense Agreement. (Dkt. 50–6 at 13–14; Dkts. 50–8, 50–9.)

Marvel's remaining arguments based on the plain language of the Agreement, in support of their position that no royalty is due for Hasbro's sales, are unpersuasive. Marvel argues that it would not be able to provide the information required by the Agreement for a third-party's sales—quarterly reports of net product sales, number of units sold, and price—nor would it have obligated itself to late payment provisions that could be impacted by a third-party. Marvel could control its ability to meet these obligations by including them in the terms of any subsequent licensing agreement, which it did in its agreement with Hasbro. Similarly, Marvel argues that if it owed Plaintiffs for *any* third-party sales, Plaintiffs' right under the Agreement to examine Marvel's financial records as to net product sales would be rendered meaningless, as those records would contain no relevant information. Because all sales within the Agreement are controlled by Marvel, and Marvel profits from Hasbro's sales, Marvel's records would, and do, provide the relevant financial information. These provisions of the Agreement do not make the existence or nonexistence of an obligation to pay Plaintiffs royalties on Hasbro's net product sales more or less probable. The Court concludes that, under the plain language of the Agreement, Marvel owes Plaintiffs a 3% royalty for anyone's product sales covered by the Agreement.

Notwithstanding this finding, there remains an ambiguity precluding summary judgment—whether any toys sold by Hasbro come within the toy categories covered by the royalty provision of the Agreement. Whether Hasbro sold any toys that would infringe the patent is a legal issue not before the Court. Also, there are genuine issues of fact regarding whether any toys sold by Hasbro are properly categorized as the "Web Blaster product that was the subject of the Action and to which the Judgment refers." Although the toy that was litigated during the 1997 Action was one specific version of the Web Blaster, Marvel has made royalty payments to Plaintiffs for many later-developed versions of the Web Blaster. Thus, determining what toys the parties intended to be covered by the Agreement will require examining the course of performance and the specific toys for which royalties are in dispute. In particular, as discussed below, the parties dispute whether Hasbro's Ultimate Web Blaster is entirely within the terms of the Agreement. Additionally, Marvel made payments to Plaintiffs for sales by Hasbro in 2007 (Dkt. 67–35), which it asserts were made in error, and Marvel negotiated, without completing a contract, for Hasbro to take over royalty payments to Plaintiffs (Dkt. 50–6 at 13–14; Dkts. 50–8, 50–9). The relevance of these facts is a matter for the trier of fact.

Accordingly, Plaintiffs are not entitled to summary judgement on Counterclaim 2.

### E. *Whether, as a Matter of Law, Marvel Owes Royalties for Improved Web Blasters and Extra Value Items*

██ Marvel alleges Plaintiffs were overpaid in 2007 for "kits," which included a Web Blaster and Extra Value Items (Counterclaim 3) and improved Web Blasters (Counterclaim 4). Plaintiffs move for summary judgment on both these claims.

Plaintiffs interpret the Agreement broadly and argue the plain language does not allow for a reduction in royalty payments based on improved Web Blaster functions nor does it distinguish between a product that includes Extra Value Items and one that does not. The Court agrees with Defendant that the plain language of the Agreement does not address this situation. Rather, it is ambiguous regarding whether royalties are due for Extra Value Items packaged with a Web Blaster or for Web Blaster versions developed after the

1997 Action. Thus, the Court must assess whether the parties' intent can be discerned from undisputed extrinsic evidence.

With respect to Extra Value Items, Plaintiffs rely on the parties' course of performance from 2001 through May 2008—Marvel paid royalties on the entirety of kits (Dkt. 50–4, ¶ 6; Dkt. 50–5, ¶ 6; Dkt. 50–2 at 2, ¶ 7; Dkt. 60 at 10, ¶ 7; Dkt. 61, ¶ 7)—as proof that there is no genuine issue of fact.[10] Marvel agrees such payments were made, but asserts they were made in error. Marvel provided a declaration from Kenneth West, Marvel's Chief Financial Officer, who attested that Marvel's payments for Extra Value Items without any deduction or allocation were a mistake, which it did not realize until it entered the licensing agreement with Hasbro. (Dkt. 61, ¶¶ 7, 10.) Marvel's assertion that its payments for Extra Value Items were made in error raises a credibility issue and a question of fact. Whether the course of performance evidences the parties' intent under the Agreement as to sales of Extra Value Items by Hasbro is a factual dispute for the trier or fact precluding summary judgment on Counterclaim 3.

With respect to "improved" Web Blasters, Defendant argues Plaintiffs are only entitled to a partial royalty for the Ultimate Web Blaster sold by Hasbro, which it categorizes as the first "multi-function" Web Blaster. Plaintiffs counter that Marvel has always paid full royalties on Web Blasters with multiple functions, such as the Dual Action and Triple Action Web Blasters and the Mega Blast Web Shooter that shot silly string, water, and darts. (Dkts. 67–14 to –17.) Defendant does not dispute that it sold toys with those functions, but claims the Ultimate Web Blaster incorporates all the functions into a single unit and does not require the user to change out canisters to use different functions. The Court cannot resolve on summary judgment whether the Ultimate Web Blaster is factually and functionally distinct from the original Web Blaster or the other products previously sold by Marvel, such that the parties' course of performance is not persuasive evidence of the parties' intent regarding royalty payments for the Ultimate Web Blaster. *See Federal Ins. Co.,* 258 A.D.2d at 44, 691 N.Y.S.2d 508 (the parties' interpretation for "any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

Additionally, Marvel contends the attachments for the prior improved versions of the Web Blaster, sold by Marvel, were properly categorized as Extra Value Items for which Marvel should not have made full payment. Because the factual dispute regarding Extra Value Items cannot be resolved on summary judgment, as discussed above, that is another issue of material fact precluding summary judgment regarding the Ultimate Web Blaster. Whether the Ultimate Web Blaster is a product within the scope of the Agreement is a question of fact precluding summary judgment on Counterclaim 4.

■ Plaintiffs' alternative legal theory of accord and satisfaction with respect to the Ultimate Web Blaster is unpersuasive. According to Plaintiffs, their acceptance of a check from Marvel, after a dispute over royalties for the Ultimate Web Blaster, acted as an accord and satisfaction.[11] *See*

---

**10.** Web Blasters packaged with Extra Value items were sold with a single SKU number. (Dkts. 50–4, ¶ 3; Dkt. 50–5, ¶ 3; Dkt. 60 at 10, ¶ 4.)

**11.** On December 13, 2007, Plaintiffs inquired with Marvel's CFO, Ken West, why the Ultimate Web Blaster was not included in the 2007 third quarter report. (Dkt. 48–7 at 2.) After partial payment and further debate (*see* Dkts. 48–7, 48–8), on January 28, 2008, Marvel agreed to pay full royalties for the Ultimate Web Blaster. (*Id.* at 17; Dkt. 48–10.)

*Patel v. Orma,* 190 A.D.2d 782, 593 N.Y.S.2d 851, 853 (1993) (acceptance of a check in full settlement of a disputed claim amounts to an accord and satisfaction). Acceptance of a check only operates a release if the parties are on notice of such a consequence, *see Sorrye v. Kennedy,* 267 A.D.2d 587, 699 N.Y.S.2d 214, 215–16 (1999), and there is no evidence the parties reached such an understanding regarding the Ultimate Web Blaster. (*See* Dkt. 48–7.) Further, accord and satisfaction requires new consideration and a meeting of the minds. *Id.* at 216 (citing *Komp v. Raymond,* 175 N.Y. 102, 67 N.E. 113 (1903)). The items Plaintiffs cite as consideration, foregoing interest payments and their right to sue, were never mentioned during the email exchanges. (Dkt. 48–7.) Further, the parties December 2007 to January 2008 email exchanges, which is the only evidence on which the parties' rely, do not establish a meeting of the minds and the execution of a new contract. (*Id.*) Plaintiffs are not entitled to summary judgment on their defense of accord and satisfaction.

## IV

### RECOMMENDATION

Defendant Marvel is entitled to summary judgment as a matter of law on Counterclaim 1(a)—Marvel is not required to pay royalties under the Agreement after the May 25, 2010 expiration of the patent. Therefore, the Magistrate Judge recommends the District Court, after its independent review of the record, deny Plaintiffs' Motion for Summary Judgment (Dkt. 49) on this issue and grant Defendant's motion (Dkt. 54). Plaintiffs have demonstrated there is no genuine issue of material fact regarding the definition of "net" product sales in the agreement—it means 93% of gross product sales. Thus, the Magistrate Judge recommends the District Court, after its independent review of the record, grant Plaintiffs' motion for summary judgment on this issue (Dkt. 51.) There are genuine issues of material fact precluding summary judgment on the issue of sales by Hasbro, improved Web Blasters and Extra Value Items. Therefore, the Magistrate Judge recommends the District Court, after its independent review of the record, deny summary judgment on Counterclaims 2, 3 and 4 (Dkts. 47, 48, 50).

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number: **CV–08–372–TUC–DCB.**

DATED this 2nd day of December, 2009.